Robert M. MCKINNEY, in his capacity as Personal Representative of the Estate of Jeffrey M. McKinney; Sherri McKinney, in her capacity as Next Friend Z.M.; Rachel McKinney, in her capacity as Next Friend J.M. and Next Friend C.M., Plaintiffs–Appellees,

v.

LEXINGTON–FAYETTE URBAN COUNTY GOVERNMENT, Defendant,

Lieutenant Randy Jones, in his individual capacity; Sergeant Nicholas Elko, in his individual capacity; Sergeant Adam Moss, in his individual capacity; Corporal Eric Legear, in his individual capacity; Corporal Clarrisa Arnold, in her individual capacity; Officer Regina Powell; in her individual capacity; Officer Donald Womack, in his individual capacity, Defendants–Appellants.

No. 15–5744

United States Court of Appeals, Sixth Circuit.

FILED June 09, 2016

Kevin Patrick Fox, Logan, Burch & Fox, Frankfort, KY, for Plaintiff–Appellee Robert M. McKinney, in his capacity as Personal Representative of the Estate of Jeffrey M. McKinney.

Richard M. Guarnieri, True Guarnieri Ayer, Frankfort, KY, for Plaintiff–Appellee Sherri McKinney, in her capacity as Next Friend Z.M.

Dan E. Siebert, Siebert & Johnson, Louisville, KY, for Plaintiff–Appellee Rachel McKinney, in her capacity as Next Friend J.M. and Next Friend C.M.

Barbara Ann Kriz, Kriz, Jenkins, Prewitt & Jones, Lexington, KY, for Defendants–Appellants Lieutenant Randy Jones, in his individual capacity, Sergeant Nicholas Elko, in his individual capacity.

William C. Rambicure, Casey Marie Keller, Miller & Wells, Lexington, KY, for Defendants–Appellants Sergeant Adam Moss, in his individual capacity, Corporal Eric Legear, in his individual capacity, Corporal Clarissa Arnold, in her individual capacity, Officer Regina Powell, in her individual capacity, Officer Donald Womack, in his individual capacity.

BEFORE: BOGGS and ROGERS, Circuit Judges; BERG, District Judge.[*]

---

[*] The Honorable Terrence G. Berg, United States District Judge for the Eastern District of Michigan, sitting by designation.

ROGERS, Circuit Judge.

On May 21, 2012, Jeffrey McKinney was incarcerated at the Fayette County Detention Center in Lexington, Kentucky. While McKinney was in the detention center, he suffered a seizure and Fayette County Detention Center Lieutenant Randy Jones, Sergeants Nicholas Elko and Adam Moss, Corporals Clarissa Arnold and Eric Legear, and Officers Regina Powell and Donald Womack[1] responded, using force to restrain and subdue McKinney. McKinney was ultimately taken to a medical center, where he was pronounced dead. The McKinney Estate[2] brought a 42 U.S.C. § 1983 action against the correctional officers, alleging that they had violated McKinney's rights under the Eighth Amendment by acting with deliberate indifference to his medical needs and by using excessive force against him. The McKinney Estate also alleged related state-law tort claims. The district court denied the officers' motion for summary judgment on the federal claims on the basis of qualified immunity and on the state-law claims on the basis of qualified official immunity.

On interlocutory appeal, the officers contend that there is insufficient evidence in the record for a reasonable juror to conclude that each officer met the subjective components of deliberate indifference and excessive force. Because this argument is premised upon the officers' challenge to the district court's conclusion that genuine issues of material fact precluded summary judgment on the basis of qualified immunity, we lack jurisdiction at this stage of the litigation to consider this aspect of the officers' appeal.

The officers also raise an abstract legal issue, which is that the district court refused to conduct an individualized assessment of each officer's qualified-immunity defense until further evidence had been presented at trial. The district court conducted a sufficiently individualized assessment of each officer's qualified-immunity defense. This argument therefore does not provide a basis for relief.

The resolution of the officers' state-law qualified-official-immunity claims depends on the same issues of fact as their federal qualified-immunity claims. Accordingly, we also lack jurisdiction to review the district court's denial of summary judgment on the McKinney Estate's state-law claims.

I.

On May 17, 2012, Jeffrey McKinney pled guilty to a second offense of operating a motor vehicle while impaired and received a fourteen-day sentence of imprisonment. R. 178–3 at PageID #2473–2474. McKinney reported to the Fayette County Detention Center (FCDC) that same day. R. 178–4 at PageID #2476. During his intake, McKinney told a nurse that he suffered from seizures, hypertension, and a traumatic brain injury and skull fracture from an ATV accident. Id.; R. 191–3 at PageID #5172–5175. On May 22, 2012, McKinney had a seizure at 12:49 pm while he was taking a shower. R. 178–11 at PageID #2502; R. 178–12 at PageID #2504. Medical staff and officers gave McKinney medical assistance and relocated him to

---

1. For simplicity, we will refer to all correctional officers, despite their rank, as "correctional officers" or "officers."

2. The plaintiffs in this case are Robert M. McKinney, in his capacity as Personal Representative of the Estate of Jeffery M. McKinney; Sherri McKinney, in her capacity as Next Friend of Z.M., a minor child of Jeffrey McKinney; and Rachel McKinney, in her capacity as Next Friend of C.M. and J.M., minor children of Jeffrey McKinney. R. 144 at PageID #2016. We will refer to the plaintiffs collectively as the "McKinney Estate."

FCDC's Medical Unit, Unit A. R. 178–11 at PageID #2502; R. 191–3 at PageID #5186.

Later that day, McKinney had a seizure while he was in Room A–9. R. 178–14 at PageID #2520–2521. Room A–9 is a room in FCDC's Medical Unit that contains eight or nine beds and is adjacent to the main open-area "program space" of the Medical Unit. R. 182–4 at PageID #3695; *Overhead Video* at 0:20–0:30. Upon the direction of a nurse, Officer Joquetta Wingate[3] toned a Code 100 on FCDC's radio at approximately 6:19 pm. R. 178–14 at PageID #2520–2521. A Code 100 is toned when an inmate is in an emergency physical condition requiring possible medical care. R. 179–2 at PageID #2766; R. 191–6 at PageID #5242–5244. Corporal Legear and Wingate went into Room A–9 in response to the Code 100 and saw McKinney lying partially on a bunk and partially on the floor. R. 178–14 at PageID #2521, R. 178–15 at PageID #2526. Legear observed that McKinney was "displaying seizure activity," had blood dripping out of his mouth, and that there was blood on the floor. R. 178–15 at PageID #2526; R. 191–8 at PageID #5266. After Legear and Wingate put McKinney on his side on the floor, R. 191–7 at PageID #5251; R. 178–14 at PageID #2521, a nurse entered Room A–9 and started wiping bloody secretions from McKinney's mouth. R. 214–1 at PageID #6561–6563.

McKinney then spat some blood out of his mouth. *Id.* at PageID #6563; R. 212–1 at PageID #6347. By this time, Jones, Elko, and Moss had entered Room A–9 in response to the Code 100. R. 178–32 at PageID #2664; R. 178–33 at PageID #2668; R. 178–34 at PageID #2671. After McKinney spat, Legear decided that McKinney needed to be restrained. R. 191–8 at PageID #5271. Officers tried to roll McKinney onto his stomach. R. 212–1 at PageID #6347. McKinney was highly erratic and defensively resistant. *Id.* As officers rolled McKinney onto his stomach, he vomited onto the floor. R. 178–32 at PageID #2664.

Jones testified that at this time, all of the officers in Room A–9 were going "hands on" trying to subdue McKinney, who was kicking, thrashing, and spitting blood. R. 76–20 at PageID #875. The officers who assisted in restraining McKinney included Jones, Elko, Moss, Arnold, Legear, and Powell. R. 178–36 at PageID #2675. Jones, Moss, and Wingate each unsuccessfully tried to perform pressure-point control techniques on McKinney to make him stop resisting. R. 178–22 at PageID #2602–2603; R. 76–20 at PageID #876; R. 178–33 at PageID #2668. A pressure-point control technique is a type of force that is used to make an inmate feel pain so that he will comply with officers' orders. R. 212–1 at PageID #6348. Elko told McKinney to stop resisting and to put his hands behind his back or Elko would use pepper spray on McKinney. R. 98–12 at PageID #1234–1235. After McKinney failed to comply with these orders, Elko administered a one- to two-second burst of pepper spray to McKinney's facial area. *Id.* at PageID #1235.

Wingate then successfully used a pressure-point control technique to subdue McKinney, and officers put handcuffs and shackles on him. R. 178–14 at PageID #2521–2522; R. 76–20 at PageID #877. Once McKinney was secured in mechanical restraints, Wingate was able to put a spit hood on McKinney. R. 178–22 at PageID #2604–2605. A spit hood is a hood that is made of mesh and filtration fabric. R. 194–1 at PageID #5860. The filtration fabric is intended to cover the lower half of the

---

**3.** Joquetta Wingate is formally Joquetta Leach-McCord. R. 76–12 at PageID #757.

inmate's face to contain contaminants and to deter biting and spitting. *Id.*

At 6:23 p.m., while the officers were trying to restrain McKinney, a Signal 7 was toned. R. 178–36 at PageID #2675. A Signal 7 means that an officer needs assistance with an inmate disturbance. R. 194–1 at PageID #5822–5823. Officer Womack went to Room A–9 in response to the Signal 7. R. 178–26 at PageID #2632. Womack testified that he went into the doorway of Room A–9, where he felt the effect of the pepper spray and saw officers trying to restrain McKinney. *Id.* at PageID #2632–2633.

A stationary overhead video that depicts the events that occurred in Room A–9 and the adjacent program space (the "Overhead Video") shows that the physical struggle that occurred when McKinney was in Room A–9 lasted for several minutes and included numerous officers. *Overhead Video* at 2:25–7:08; R. 98–10; R. 105. Nurses were present in Room A–9 during some portions of the physical struggle. *Overhead Video* at 2:25–7:08. Medical staff in the program space also observed McKinney through windows that provided a view into Room A–9. *Id.*

After McKinney was put in handcuffs and shackled, officers put him on a bunk in Room A–9 so that the medical staff could decontaminate the pepper-spray residue. R. 178–33 at PageID #2668; R. 178–32 at PageID #2664. Jones determined that McKinney "continu[ed] to be unstable" and should be taken to the program space "where [a] medical assessment and decontamination could be completed." *Id.* Several officers escorted McKinney out of Room A–9 and into the program space. *Overhead Video* at 8:32–9:12. Once McKinney was in the program space, officers tried to seat him on a plastic chair. *Id.* at 9:12–10:30. McKinney resisted the officers' efforts to put him in the plastic chair by "thrusting

his body around out of the chair." *Id.*; R. 98–12 at PageID #1243.

Jones determined that McKinney should be secured in a restraint chair. R. 178–32 at PageID #2664. A restraint chair is a chair that is used to restrain a violent, out-of-control inmate. R. 194–1 at PageID #5861. The chair holds the inmate's torso upright and includes many straps and belts to secure the inmate in the chair. *Id.*; R. 76–20 at PageID #881. Womack obtained the restraint chair and assisted Jones, Elko, Moss, Legear, and other officers in securing McKinney in the chair. R. 178–32 at PageID #2664; R. 178–38 at PageID #2681. McKinney struggled with the officers as they attempted to put him in the restraint chair. *Overhead Video* at 10:30–11:00. During this struggle, Jones and Legear gave McKinney verbal commands to stop resisting, and Legear used a pressure-point control technique in an attempt to gain McKinney's compliance. R. 178–38 at PageID #2681.

While the officers were securing McKinney in the restraint chair, Powell obtained a handheld video camera so that she could record the incident. R. 178–35 at PageID #2673. Powell started recording soon after McKinney was secured in the restraint chair. *Overhead Video* at 14:11–14:15. Powell's video recording (the "Handheld Video") shows that when McKinney was in the restraint chair, he repeatedly bobbed his head, grunted, and said "okay." *Handheld Video* at 0:00–1:00. An officer then described the incident that had occurred in Room A–9: "Legear was in there trying to help [McKinney]. He was down because he had a seizure and he starts spitting on the nurse." *Id.* at 1:05–1:12.

Although McKinney was secured in the restraint chair, he continued to show signs of agitation, repeatedly yelling in pain, convulsing his entire body, rocking his head back and forth, spitting into his spit

hood, and saying "oh fuck." *Id.* at 1:15–3:40. The spit hood contained multi-colored liquids, and McKinney's face and neck were flushed. *Id.* Jones and Legear held McKinney's head and shoulders as he sat secured in the restraint chair. *Id.*; R. 76–20 at PageID #881; R. 178–15 at PageID #2526. Jones and Legear tried to reassure McKinney, telling him "We know it hurts" and asking him to calm down. *Handheld Video* at 1:15–3:40.

While McKinney was confined in the restraint chair, officers and medical staff stood and walked around within a few feet of McKinney. *Overhead Video* at 10:30–23:15. The medical staff did not tell the officers that McKinney was in danger or that their actions were medically contraindicated. *Handheld Video* at 0:00–8:30. However, no officer or nurse conducted a hands-on medical assessment of McKinney while he was in the restraint chair. *Id.*; *Overhead Video* at 10:30–23:15; R. 214–1 at PageID #6572, #6574.

The only medical treatment that McKinney received when he was in the program space was an injection of Ativan. R. 214–1 at PageID #6572–6574. Ativan is a drug that nurses at the FCDC give to inmates who have suffered from seizures in order to calm the inmates down and to help prevent the inmates from having additional seizures. *Id.* at PageID #6574. A nurse administered the injection of Ativan to McKinney and told Jones that it should take effect within 10 to 15 minutes. *Id.* at PageID #6574; R. 76–20 at PageID #882; *Handheld Video* at 3:36–4:00. After receiving the shot, McKinney repeatedly stated "please" and "help." *Id.* at 3:50–5:05. About a minute after getting the shot, McKinney stopped convulsing his entire body and yelling, but continued rocking his head back and forth and from side to side and repeating "okay." *Id.* at 5:05–7:08. He then became more lethargic, ceasing to say

"okay" but continuing to rock his head. *Id.* at 7:08–8:30. At approximately 6:40 pm, Jones directed Elko to clear the Code 100 and Signal 7. R. 178–32 at PageID #2664.

Officers then wheeled McKinney in the restraint chair from the program space to Room A–1, a small room in the Medical Unit. *Handheld Video* at 8:30–9:10; R. 178–38 at PageID #2681. Jones, Elko, Moss, Legear, and Womack entered Room A–1. R. 178–32 at PageID #2664–2665; R. 178–15 at PageID #2526. Jones told McKinney that the officers were going to remove him from the restraint chair and put him into a boat. *Handheld Video* at 9:10–9:50; R. 76–20 at PageID #883, #906. A "boat" is a term that the FCDC staff use to describe a bunk-bed that is located on the floor. R. 178–22 at PageID #2606. McKinney repeated "okay." *Handheld Video* at 9:50–10:20. The officers began the process of removing the straps from the restraint chair and the shackles from McKinney's feet. *Id.* at 10:00–11:30; R. 178–15 at PageID #2526; R. 178–32 at PageID #2665. Although the McKinney Estate contends that Legear remained in Room A–1 during the entire time that McKinney lay in the boat, Appellees' Br. at 10–11, the Handheld and Overhead Videos show that Legear left Room A–1 at this time because his gloves broke. *Handheld Video* at 11:10–11:16; *Overhead Video* at 25:28–25:35; R. 178–15 at PageID #2526.

Jones, Elko, Moss, and Womack lifted McKinney out of the restraint chair. *Handheld Video* at 11:30–11:50; R. 178–32 at PageID #2665. As these officers held McKinney over the boat, several officers told McKinney to get on his knees. *Handheld Video* at 11:50–12:00. Although the officers contend that they did not strike McKinney with their knees at this point, Appellants' Br. at 19, the Handheld Video shows that at least one officer may have

used his knee to force McKinney into the boat. *Handheld Video* at 11:50–12:05.

The officers contend that they placed McKinney in the boat on his side in a recovery position, but for the purpose of this appeal we accept the McKinney Estate's allegation that they placed McKinney in a face-down, prone position on his stomach. *Handheld Video* at 12:05–13:40; Appellants' Br. at 19–20. It is clear that for much of this period he was face-down. As McKinney lay in the boat with his hands handcuffed behind his back, two officers held McKinney in the boat by keeping their hands and knees on his back. *Handheld Video* at 12:05–13:40.

Jones directed a nurse to administer a saline solution to McKinney so that Jones could decontaminate the pepper-spray residue on McKinney's facial area. *Handheld Video* at 12:42–12:52; R. 76–20 at PageID #885, #900. Jones took off McKinney's spit hood and observed that he had vomit residue on his face. R. 76–20 at PageID #900. With the assistance of a nurse, Jones decontaminated the pepper-spray residue from McKinney's face. *Id.* at PageID #885; *Handheld Video* at 12:52–13:38. Jones also removed some of the residue of vomit from McKinney's face and did a preliminary finger sweep of his mouth. R. 76–20 at PageID #900.

After observing that McKinney was non-responsive, officers realized that he appeared to have stopped breathing. *Handheld Video* at 13:50–16:30. Officers yelled for McKinney to be rolled over and called for nurses. *Id.* at 16:20–16:30. An officer then requested a Code 101 at approximately 6:50 pm. *Id.* at 16:40; R. 178–14 at

PageID #2522. A Code 101 is toned when an inmate has no apparent pulse or respiration. R. 194–1 at PageID #5822. Officers then removed McKinney's handcuffs and began performing CPR on him. *Handheld Video* at 16:40–17:30. The officers vigorously performed CPR on McKinney for over five minutes until the Lexington Fire Department Emergency Care Unit arrived and assumed care of him. R. 178–33 at PageID #2668. The Code 101 was cleared at 7:07 pm. R. 178–32 at PageID #2665.

McKinney was transported to the University of Kentucky Medical Center, where he was declared dead at approximately 7:35 pm. R. 178–33 at PageID #2668; R. 178–39 at PageID #2684. The coroner stated that McKinney's cause of death was asphyxia, aspiration of gastric contents, and seizure disorder, with significant contributing factors of hypertensive cardiovascular disease and morbid obesity. *Id.*

The McKinney Estate filed suit in Kentucky state court against Jones, Elko, Moss, Arnold, Legear, Powell, and Womack. R. 1–4 at PageID #254–266.[4] After the defendants removed the case to federal district court, the McKinney Estate filed an amended complaint in which it alleged that the officers had violated McKinney's civil rights under 42 U.S.C. § 1983 by acting with deliberate indifference to his medical needs and by using excessive force against him in violation of the Eighth Amendment. R. 1; R. 144 at PageID #2022–2030, #2033–2050. The McKinney Estate also alleged state-law negligence, intentional assault, intentional infliction of emotional distress, wrongful death, and loss of consortium claims against the offi-

4. The McKinney Estate also alleged claims against the Lexington–Fayette Urban County Government; the Lexington–Fayette Urban County Government, Division of Community Corrections; Officer Wingate; Corizon, Inc.; and numerous nurses. R. 144 at PageID #2014–2094. Corizon, Inc. is a company that provided medical care for the inmates at FCDC. R. 179–1. The McKinney Estate's claims against these defendants are not at issue in this appeal.

456

cers. R. 144 at PageID #2091–2093.[5] The officers moved for summary judgment on the federal claims on the basis of qualified immunity and on the state-law claims on the basis of qualified official immunity. R. 76–1 at PageID #726–737, R. 176 at PageID #2380–2382; R. 185 at PageID #4977–4999.

The district court denied the officers' motions for summary judgment. With respect to the deliberate indifference claim, the district court determined that there was a genuine issue of material fact regarding the following facts:

Officer Wingate toned a Code 100 at 6:19 p.m. for assistance in A9, a cell in the Medical Unit. Therefore, medical staff and officers responding to the code were aware that an inmate was suffering a medical emergency while housed in the Medical Unit. Officers Clarissa Arnold, Nicholas Elko, Randy Jones, Eric Legear, Adam Moss, and Regina Powell responded to Officer Wingate's Code 100. Then, during the struggle that ensued in cell A9, Officer Arnold requested a Signal 7 for assistance in Unit A. Correctional officers who responded to the signal were aware that fellow officers needed assistance with an inmate who was struggling in the Medical Unit. Officer Donald Womack responded to the Signal 7. . . .

After issuing the Code 100 and Signal 7, the correctional officers removed McKinney from cell A9 and secured him in a restraint chair. Once he was secured in the restraint chair, the correctional officers discussed what had happened to cause both the Code 100 and Signal 7. An officer in the program space clearly explained that "Legear was in [A9] try-

ing to help [McKinney], he was down because he had a seizure, and he starts spitting on the nurse."

Therefore, once McKinney was secured in the restraint chair, . . . the correctional officers knew the following facts: (1) McKinney was located in the Medical Unit; (2) He suffered a medical emergency, specifically a seizure; (3) He was bleeding from the mouth after suffering his second seizure; (4) He had vomited at least once; (5) He received a two-second burst of pepper spray; (6) He struggled with the officers for over seven minutes *after* having experienced his second seizure that day; and (7) His spit hood contained multi-colored fluids.

While McKinney was secured in the restraint chair, . . . it was obvious that he was at a substantial risk of serious harm and that many of the correctional officers that were present had "sufficient exposure" to McKinney's medical concerns.

Objectively, McKinney's distress was so obvious that even a lay person would easily recognize his need for medical treatment. He was clearly in a vulnerable state. The failure to provide medical treatment detrimentally exacerbated McKinney's medical issues; he died.

. . . [S]ome of the Defendant–Officers concede knowledge of the numerous factors that created McKinney's vulnerable state and admit they knew that McKinney needed medical attention following his seizure and prolonged struggle before being confined to the restraint chair. [with citation references to the depositions and incident reports of Jones, Elko, Legear, and Moss].

---

5. The district court dismissed the McKinney Estate's intentional infliction of emotional distress claim. *McKinney v. Lexington–Fayette Urban Cty. Gov't*, No. 5:12–CV–360–KKC,

2015 WL 4042157, at *12 (E.D. Ky. Jul. 1, 2015). That claim is not at issue in this appeal.

*McKinney*, 2015 WL 4042157 at *7–8 (emphasis in original) (internal citations omitted).

The district court then made the legal conclusion that a fact-finder could determine that the officers met the objective and subjective standards for deliberate indifference under *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir.2013), and *Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir.2013). *McKinney*, 2015 WL 4042157, at *8. However, the district court added that it would "defer ruling on whether a particular [officer] may invoke qualified immunity until the evidence at trial establishes the officer's knowledge at each critical point in time between McKinney's second seizure and his death." *Id.*

With respect to the excessive-force claim, the district court determined that there was a genuine issue of material fact regarding the following facts:

Officers Wingate and Legear first responded to McKinney. Both officers saw McKinney spit and perceived his actions as overt defiance; however, the officers assisted McKinney during his second seizure of the day, observed that he had severely bitten his tongue, and noted that he had a lot of bloody, frothy saliva secretions coming out of his mouth.

Officers Arnold, Elko, Jones, Moss, and Powell arrived after McKinney ceased actively seizing, but all officers responded to a Code 100—a *medical* emergency—in the *Medical* Unit. Nonetheless, the officers quickly escalated the amount of force used against McKinney; all seven officers "g[o]t physical" and "assisted with restraining" McKinney within minutes of his second seizure. And rather than attempting to pacify a medically delicate situation, multiple officers performed mandibular angle pressure point control techniques and Officer[] Elko administered a two-second burst of pepper spray to McKinney's face.

After McKinney had suffered his second seizure, endured seven correctional officers "going hands on" for approximately five minutes, received multiple mandibular angle pressure point control techniques, and experienced a two-second burse of pepper spray to his face, Officer Jones determined that McKinney "continued to be unstable." Officer Wingate put a spit hood over McKinney's head. Nine different officers then assisted in picking McKinney up, dragging him to the program space, forcing him into the restraint chair, and securing him into the chair.

Later, the correctional officers decided to move McKinney to an isolated cell in the Medical Unit. Inside cell A1, the correctional officers removed many of McKinney's restraints, but he remained handcuffed and shackled. Some officers then lifted McKinney out of the restraint chair. The officers told him to kneel down in the boat. McKinney—having experienced two seizures in one day, actively struggled with correctional officers for over seven minutes, received no medical care, and remained handcuffed and shackled with a spit hood on his head—did not immediately kneel. The correctional officers then commenced striking McKinney with their knees and forced McKinney into a prone position in the boat. At least one officer kept a hand or knee on top of McKinney's back at all times to keep him in the prone position. Within minutes of being forced into the prone position, McKinney ceased breathing.

[With respect to the subjective element of excessive force: ] First, McKinney died. Second, it is not clear that the

officers needed to apply force at all—officers saw blood and froth in McKinney's mouth after his second seizure; it is understandable that he would clear the blood and froth from his mouth—to apply considerable force over an extended period, or to apply any additional force once he was secured in the restraint chair. Third, officers used more force than was needed. The officers were responding to a *medical* emergency, McKinney only exhibited defensive resistance after officers escalated the use of force, and McKinney did not actively threaten anyone. Fourth, the officers did not perceive a threat. The correctional officers did *not* need to make *any* split-second decisions. Finally, there is no evidence that the officers sought to deescalate the situation.

[With respect to the objective element of excessive force:] The officers "got physical" with McKinney, applied mandibular angle pressure point control techniques, administered a two-second burst of pepper spray, secured him in a restraint chair for over thirteen minutes, struck him with their knees, pinned him down in the boat, and physically struggled with him for over seven minutes. Further, this altercation ultimately ended in McKinney's death. McKinney experienced significant injury because of "prison officials['] malicious[] and sadistic [] use [of] force...."

*Id.* at *9–10 (emphases in original) (internal citations omitted).

As a legal matter, the district court held that, accepting these facts, the subjective and objective components for excessive force could be found. *Id.* at *11. However, the district court again stated that it would "defer ruling on whether a particular [officer] may invoke qualified immunity until the evidence at trial establishes the amount of force used by each [officer] at

each particular time and the [officer's] rationale for applying force at that time." *Id.*

The district court also held that since the officers may have violated McKinney's clearly established constitutional rights, the doctrine of qualified official immunity did not shield the officers from liability against the McKinney Estate's state-law tort claims. *Id.*

## II.

### A.

■ We lack jurisdiction to consider Jones, Elko, Moss, Legear, and Womack's argument that the McKinney Estate has not shown sufficient evidence to get to a jury on the deliberate-indifference and excessive-force claims. This is because this argument is premised upon factual disputes, not abstract questions of law. A district court's denial of a claim of qualified immunity is an "appealable, 'final decision'" under 28 U.S.C. § 1291 only to "the extent that [the denial] turns on an issue of law." *DiLuzio v. Village of Yorkville,* 796 F.3d 604, 609 (6th Cir.2015) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). The central argument that the officers raise on appeal—as described in the officers' summary of their argument—is:

The [d]istrict [c]ourt erred in denying qualified immunity on the individual capacity § 1983 claims against [the officers].... [I]t is clear that [the McKinney Estate has] failed to raise a material issue of fact sufficient to withstand summary judgment to support [its] Eighth Amendment claims. Even conceding facts as alleged by [the McKinney Estate], there is clearly insufficient evidence upon which a reasonable fact finder could conclude that each of the [officers], individually, had sufficient knowledge from which an in-

ference could be drawn that there was a substantial risk of serious harm to McKinney, much less that they each actually drew that inference and chose to disregard it. In the same vein, there is inadequate proof that could support a finding that each of the [officers], individually, applied force maliciously or sadistically for the purpose of causing harm, or applied force with a knowing willingness that harm would occur to McKinney.

Appellants' Br. at 21–22. As this summary indicates, the officers' arguments are grounded entirely upon their refusal to accept the district court's conclusion that there was sufficient evidence to create a genuine issue of material fact. Jones, Elko, Moss, Legear, and Womack's individualized arguments are also premised upon factual disputes. For instance, Jones, Elko, Moss, Legear, and Womack contend that there is no evidence in the record upon which to base a finding that each of these officers could have inferred that there was a substantial risk of serious harm to McKinney. *Id.* at 31, 33, 37, 38, 40. The officers also argue that they did not use excessive force against McKinney in part because "[t]he evidence is uncontroverted that none of the officers believed that McKinney was having a seizure at the point they intervened to restrain him." *Id.* at 43.

This court lacks jurisdiction to resolve these factual disputes. The Supreme Court held in *Johnson v. Jones* that a defendant may not appeal a district court's denial of summary judgment on the basis of qualified immunity "insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." 515 U.S. 304, 319–20, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). This court has repeatedly held that *Johnson* precludes this court from deciding an interlocutory appeal that challenges "the district court's

determination of ' "evidence sufficiency," *i.e.*, which facts a party may, or may not, be able to prove at trial.' " *DiLuzio*, 796 F.3d at 609 (quoting *Johnson*, 515 U.S. at 313, 115 S.Ct. 2151); *Kindl v. City of Berkley*, 798 F.3d 391, 399 (6th Cir.2015). This court has also repeatedly held that "a defendant may not challenge the inferences the district court draws from those facts, as that too is a prohibited fact-based appeal." *DiLuzio*, 796 F.3d at 609 (citing *Romo v. Largen*, 723 F.3d 670, 673–74 (6th Cir.2013)). This is because the "[f]actual 'inferences' capable of being drawn from the evidence are still inherently factual determinations about what parties 'may, or may not, be able to prove at trial.' " *Kindl*, 798 F.3d at 400 (quoting *Johnson*, 515 U.S. at 313, 115 S.Ct. 2151).

In *Kindl v. City of Berkley*, this court held that these jurisdictional limitations precluded this court from considering the defendants' arguments that there was insufficient evidence to establish that they were aware of an inmate's serious medical need. 798 F.3d at 398–99. In so holding, this court explained that the defendants' principal arguments "reduce[d] merely to a factual contention that [the p]laintiff cannot prove that they should have known of, much less that they were in fact aware of, [the inmate's] serious medical need." *Id.* at 398. This court also rejected the defendants' argument that this court had jurisdiction to review the inferences that the district court drew from the record about their awareness of the inmate's serious medical need. *Id.* at 400–01. In declining to embrace interlocutory jurisdiction over these factual inferences, this court explained an appellate court was "in no better a position than the district court—or more to the point, a jury—to determine whether based on [the inmate's] statements, convulsions, alleged moans, requests for attention, and appearance, [the

d]efendants subjectively understood the gravity of her situation." *Id.*

We lack jurisdiction to consider Jones, Elko, Moss, Legear, and Womack's arguments that there was insufficient evidence to establish that they violated McKinney's constitutional rights for the same reason that we lacked jurisdiction to consider the defendants' arguments in *Kindl*: These arguments are, at bottom, impermissible attempts to challenge the factual inferences that the district court determined could be drawn by the jury from the evidence. The district court determined that there was sufficient evidence in the record to create a genuine issue of material fact about whether each officer drew the inference that there was a substantial risk of serious harm to McKinney and chose to disregard that inference. *McKinney*, 2015 WL 4042157, at *8. The district court also concluded that there was adequate evidence to support a determination that each officer used force maliciously or sadistically to cause harm to McKinney. *Id.* at *11. We are bound by these determinations at this interlocutory point in the litigation.

To be sure, we may review the district court's determination that there was a genuine issue of material fact if "the district court's determination that a dispute of fact exists is blatantly and demonstrably false." *Clay v. Emmi*, 797 F.3d 364, 368 (6th Cir.2015) (internal citation and quotation marks omitted). An appellate court may exercise jurisdiction to hear and reverse such holding where "the plaintiff's version of the facts, which the district court accepted, was 'so utterly discredited by the record . . . that no reasonable jury

could have believed him.' " *Romo*, 723 F.3d at 674 n. 3 (quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)). The classic example of this is a clearly dispositive videotape of the relevant action. *See Scott*, 550 U.S. at 378–81, 127 S.Ct. 1769. There are videotapes in this case as described above, but they simply do not blatantly contradict any of the district court's factual determinations. Accordingly, we lack jurisdiction to review the district court's conclusion that there were genuine issues of material fact about whether each of the officers violated McKinney's constitutional rights.

A careful look at the officers' deliberate-indifference arguments confirms that these arguments are premised entirely upon impermissible attempts to challenge the district court's factual determinations. The officers contend that their testimony about their lack of awareness of McKinney's medical condition and their observations of McKinney's non-compliant and resistant behavior establish that they lacked sufficient knowledge to draw an inference that McKinney was at a substantial risk of serious harm. Appellants' Br. at 30–40. The district court disagreed. The district court concluded that each of the officers may have been aware of the contextual facts that made it "obvious" to a layperson that McKinney needed medical treatment. *McKinney*, 2015 WL 4042157, at *7–8. The officers refuse to accept this conclusion. Accordingly, this aspect of the officers' argument is premised upon the officers' impermissible attempts to challenge the factual inferences that the district court drew from the evidence in the record.[6]

---

6. Jones, Elko, Moss, Legear, and Womack also rely on the fact that the "medical staff were present and observing," during the incident but "never once attempted to deter any of [the officers] or instruct them that their actions were medically contraindicated." Appellants' Br. at 29. The officers do not cite any cases that establish that the district court made a legal error when it concluded that the officers may have been deliberately indifferent to McKinney's serious medical needs even though the medical staff were present during

The same is true with respect to the officers' excessive-force arguments. The officers contend that they used force against McKinney in a good-faith effort to maintain safety and discipline because they observed McKinney acting physically aggressive and refusing to comply with orders. The officers also argue that they had a reasonable basis to use force against McKinney because they were not aware that he had suffered a seizure when they intervened to restrain him. Appellants' Br. at 43–52. The district court disagreed. The district court concluded that the officers may have used unnecessary force in part because McKinney exhibited only defensive resistance after the officers escalated the use of force and did not actively threaten anyone. *McKinney*, 2015 WL 4042157, at *10. The district court also concluded that the officers did not perceive McKinney to be a threat and were aware that he was having a medical emergency. *Id.* This court lacks jurisdiction to review the district court's factual findings about the amount of resistance and aggression that McKinney exhibited, the officers' perceptions of the threat that he posed, and the officers' awareness of his medical distress.

Moreover, the Overhead Video does not compel a conclusion that McKinney engaged in aggressive, non-complaint behavior that justified the use of force against him. The Overhead Video does not clearly show the movements of McKinney or the officers during the physical struggle that occurred in Room A–9. *Overhead Video* at 2:25–7:08. The Overhead Video therefore does not objectively eliminate the possibility that McKinney exhibited only defensive resistance after the officers escalated the use of force against him and did not actively threaten anyone.

Jones, Elko, Moss, and Womack also claim that they did not use excessive force when they took McKinney out of the restraint chair and placed him in the boat in Room A–1. Appellants' Reply Br. at 19–20. To support this argument, the officers contend that the Handheld Video "speaks for itself" about their actions in Room A–1. *Id.* at 24–25. Jones, Elko, Moss, and Womack also argue that their testimony establishes that they took McKinney out of the restraint chair and placed him in the boat not to "punish, discipline, or otherwise mistreat" him, but so that he "could rest while medical staff assessed him and while the officers changed him out of his jumpsuit and into a new one." *Id.* at 19–20, 25.

These arguments are premised upon factual disputes about the officers' motives for moving McKinney into the boat. The district court determined that there may have been no need for the officers to use "any additional force once [McKinney] was secured in the restraint chair," and we must accept that fact at this point in the litigation. *McKinney*, 2015 WL 4042157, at *10. A defendant makes an impermissible fact-based appeal when he "challenge[s] directly the plaintiff's allegations (and the district court's acceptance)" of "why an action was taken or omitted." *DiLuzio*, 796 F.3d at 609 (citation omitted).

Moreover, the Handheld Video does not utterly discredit the district court's conclusion that the officers may have used excessive force when they placed McKinney in the boat. The Handheld Video appears to

---

the incident. The officers' arguments about the medical staff therefore pose questions of fact capable of resolution by competent evidence, including evidence about the officers' observations of facts that indicated that McKinney was in medical distress, the train-

ing that the officers received about how to care for an inmate who was in medical distress, and the officers' perceptions about the adequacy of the treatment that the medical staff provided to McKinney.

show one officer using his knee to force McKinney into the boat. *Handheld Video* at 11:50–12:05. The other officers' knees are not visible on the Handheld Video at this time. *Id.* The district court therefore identifies as a genuine issue whether, consistent with the Handheld Video, multiple officers struck McKinney with their knees in order to force him face-down into the boat. *McKinney*, 2015 WL 4042157, at *10. The Handheld Video also supports the district court's determination that "[a]t least one officer kept a hand or knee on top of McKinney's back at all times to keep him in the prone position." *Id.* This is because the Handheld Video shows that several officers placed their hands and knees on McKinney's back while he was positioned face-down in the boat. *Handheld Video* at 12:05–13:40. The Handheld Video also shows that while the officers were placing McKinney on the boat, McKinney was only defensively resistant, did not actively threaten anyone, and had his hands handcuffed behind his back. *Id.* at 11:35–13:40. The Handheld Video therefore does not blatantly contradict the district court's conclusion that since *McKinney* was not actively resistant and did not pose a threat, the officers may not have needed to strike McKinney with their knees or pin him down in the boat.

The officers also attempt to circumvent the jurisdictional limitations of this court by citing cases in which this court upheld the use of force to subdue non-compliant or physically resistant individuals. These arguments are unavailing because these cases are analogous only if we accept the officers' version of the facts and ignore the factual inferences that the district court drew from the evidence in the record.

For instance, Elko relies on cases in which this court has approved the application of stun guns or chemical agents on inmates who refused to follow reasonable commands to support his contention that he did not use excessive force against McKinney. Appellants' Br. at 51; *Jennings v. Mitchell*, 93 Fed.Appx. 723, 725 (6th Cir.2004); *Caldwell v. Moore*, 968 F.2d 595, 600 (6th Cir.1992). Elko claims that these cases show that his use of pepper spray against McKinney was reasonable because Elko "reasonably believed that McKinney was able to understand what the correctional staff [were] saying to him and intentionally disobeyed their verbal commands." Appellants' Br. at 51. However, as stated above, the district court determined that Elko may have observed facts that made it obvious that McKinney was having a medical emergency. There was thus an issue of fact about whether Elko believed that McKinney's medical distress rendered him unable to understand or comply with the officers' orders. Accordingly, Elko's reliance on these cases is premised upon his refusal to accept the district court's version of the facts.

**B.**

Jones, Elko, Moss, Legear, and Womack do raise a legal issue that we have jurisdiction to consider, which is their contention that the district court failed to individually evaluate their qualified-immunity claims. However, the district court's assessment of the officers' qualified-immunity claims was sufficiently individualized. This argument therefore does not provide a basis for relief.

We have jurisdiction to consider the officers' argument that the district court failed to individually evaluate their qualified-immunity claims because this argument is premised upon a question of law, not a factual dispute. Because the doctrine of qualified immunity provides "immunity from suit rather than a mere defense to liability," a district court makes a "legal error" when it fails to rule on the

merits of a defendant's qualified-immunity defense before trial. *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526–27 (6th Cir. 2002). Accordingly, this court has interlocutory jurisdiction to review a district court's denial of a defendant's qualified immunity claim when that denial is premised upon the court's refusal to determine whether there is a genuine issue of fact remaining for trial. *Id.*

Jones, Elko, Moss, Legear, and Womack contend that the district court refused to determine whether there was a genuine issue of fact about whether they each met the subjective components of deliberate indifference and excessive force until further evidence had been presented at trial. Appellants' Br. at 28–29, 42–43. To support this contention, the officers cite the district court's statements that the court would "defer ruling on whether a particular [officer] may invoke qualified immunity until the evidence at trial" provided more information about the officer's state of mind and actions during the incident that led to McKinney's death. Appellants' Br. at 28, 42–43 (citing *McKinney*, 2015 WL 4042157, at *8, 11). The officers' contention can be construed as raising the legal question of whether the district court refused to determine before trial if a genuine issue of fact precluded summary judgment on each officer's qualified-immunity claim. Accordingly, this court has jurisdiction to consider this aspect of the officers' appeal.

Our exercise of appellate jurisdiction is consistent with our holding in *McGraw v. Madison Twp.*, 231 Fed.Appx. 419, 422 (6th Cir.2007), that we lacked jurisdiction to consider the defendant police officers' argument that the district court "failed to consider each officer's liability individually." In *McGraw*, the argument was merely an "attempt[ ] to recast evidence sufficiency claims as legal arguments," 231 Fed. Appx. at 422, because the argument was at bottom based on evidence sufficiency. In contrast, defendants' argument in this case, generously construed, is based not so much on evidence sufficiency as on the district court's purported declining to rule individually with respect to the individual officers' claims of qualified immunity.

■ However, considered as a legal contention, the claim fails. Although the district court sometimes referred to Jones, Elko, Moss, Legear, and Womack collectively as the "officers" or the "correctional officers," the district court made individualized factual findings about each officer's actions and state of mind during the incident that led to McKinney's death. Based on these findings, the district court determined that there were genuine issues of fact about whether these officers each met the subjective components of deliberate indifference and excessive force. The district court therefore conducted a sufficiently individualized assessment of each officer's qualified-immunity claim.

With respect to deliberate indifference, the district court conducted a sufficiently individualized assessment of the subjective component of deliberate indifference as to Jones, Elko, Moss, Legear, and Womack. When multiple defendants assert qualified-immunity defenses, the district court must conduct an individualized assessment of the subjective component of deliberate indifference as to each defendant. *Phillips v. Roane Cty.*, 534 F.3d 531, 542 (6th Cir. 2008) (citing *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir.2005)). "[T]he subjective component requires a plaintiff to 'allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk.'" *Phillips*, 534 F.3d at 540 (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir.

2001)). Since prison officers "do not readily admit the subjective component, a factfinder may infer from circumstantial evidence, including the very fact that the risk was obvious, that a prison official knew of a substantial risk." *Santiago*, 734 F.3d at 591 (internal quotation marks and citation omitted). The district court found genuine issues of material fact regarding Jones, Elko, Moss, Legear, and Womack that (1) each of these officers was aware of facts that indicated that McKinney was in medical distress; (2) each officer drew the inference that there was a substantial risk of serious harm to McKinney; and (3) each officer disregarded that risk by failing to obtain proper medical treatment for McKinney.

First, the district court concluded that Jones, Elko, Moss, Legear, and Womack each may have been aware of facts that indicated that McKinney was in medical distress. The district court explained:

> [O]nce McKinney was secured in the restraint chair, context illustrates that the correctional officers knew the following facts: (1) McKinney was located in the Medical Unit; (2) He suffered a medical emergency, specifically a seizure; (3) He was bleeding from the mouth after suffering his second seizure; (4) He had vomited at least once; (5) He received a two-second burst of pepper spray; (6) He struggled with the officers for over seven minutes *after* having experienced his second seizure that day; and (7) His spit hood contained multi-colored fluids.

*McKinney*, 2015 WL 4042157, at *7 (emphasis in original) (internal citations omitted). The district court's factual findings about Jones, Elko, Moss, Legear, and Womack establish that each of these officers may have been aware of all of these facts. The district court explained that Jones, Elko, Moss, and Legear all partici-

pated in the struggle that occurred in Room A–9. *Id.* at *2. The district court also concluded that Womack went to the Medical Unit in response to the Signal 7 and that the Signal 7 was toned during the physical struggle that occurred in Room A–9. *Id.* at *7. There was therefore a genuine issue of fact as to whether each of these officers observed the facts that indicated that McKinney was in medical distress while he was in Room A–9. Further, such a question existed as to whether each of these officers was present when an officer "clearly explained that 'Legear was in [Room A–9] trying to help [McKinney], he was down because he had a seizure and he starts spitting on the nurse.'" *Id.*

Second, the district court concluded that the officers' awareness of these facts provided them with a sufficient basis to infer that there was a substantial risk of serious harm to McKinney. The district court stated that "[w]hile McKinney was secured in the restraint chair, the context indicates that it was obvious that he was at a substantial risk of serious harm." *Id.* at *8. To support this conclusion, the district court cited FCDC training materials explaining that "a seizure exhausts *every* muscle in the body" and explaining that "an inmate is at an elevated risk of sudden death" due to Sudden Custody Death Syndrome "after struggling with correctional officers for at least three minutes." *Id.* (citing R. 194–1 at PageID #5809, #5832, #5834–5835, #5848, #5853) (emphasis in original). Since this information was included in lesson plans and training materials for "pre-service recruits," R. 194–1 at PageID #5803, #5827, and since Jones, Elko, Moss, Legear, and Womack testified that they completed the detention center's training program for pre-service recruits, R. 193–2 at PageID #5599; R. 193–3 at PageID #5654, #5659–5660; R. 193–4 at PageID #5712–5714; R. 193–5 at PageID #5729–5732; R. 195–1 at PageID #5909–

5911, each of these officers may have been taught about the risks of seizures and Sudden Custody Death Syndrome. This evidence raised a question of fact as to whether each of these officers was in a position to infer that there was a substantial risk of serious harm to McKinney based on their training and observations of facts that indicated that he was in medical distress.

Third, the district court concluded Jones, Elko, Moss, Legear, and Womack may have disregarded the substantial risk to McKinney. The district court explained that the officers "were not free to ignore the obvious dangers to McKinney." *McKinney*, 2015 WL 4042157, at *8. The district court also explained that when McKinney was in the restraint chair, he did not receive a medical assessment or any medical treatment except for an injection to calm him down. *Id.* at *3. The district court therefore must have determined that each of the officers may have ignored the obvious dangers to McKinney by failing to obtain proper medical treatment for him. Accordingly, the district court conducted a sufficiently individualized assessment of the subjective component of deliberate indifference.

The district court also conducted a sufficiently individualized assessment of the subjective component of excessive force. Because "it is well-settled that qualified immunity must be assessed in the context of each individual's specific conduct," *Reilly v. Vadlamudi*, 680 F.3d 617, 624 (6th Cir.2012), a court must determine whether each prison official individually met the subjective component of excessive force. "[T]he subjective component focuses on the state of mind of the prison officials. We ask whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Cordell v. McKinney*, 759

F.3d 573, 580 (6th Cir.2014) (internal quotation marks and citations omitted). In *Hudson v. McMillian*, 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), the Supreme Court held that this analysis is guided by a number of factors, including (1) the extent of the inmate's injury; (2) the need for the application of force; (3) the relationship between that need and the amount of force used; (4) the threat that the officials reasonably perceived; and (5) any efforts to temper the severity of a forceful response.

The district court's analysis of the *Hudson* factors, in addition to the court's factual findings about each officer's actions and state of mind during the incident, establish that the court conducted a sufficiently individualized assessment of the subjective component of excessive force. The district court noted that since McKinney died, the first *Hudson* factor indicated that the officers met the subjective component of excessive force. *McKinney*, 2015 WL 4042157, at *10. This factor applies to Jones, Elko, Moss, Legear, and Womack individually because the district court concluded that each of these officers used force against McKinney at some point during the incident that led to his death. *Id.* at *2–4, 9–10. Second, the district court explained the officers may not have "needed to apply force at all[,] ... to apply considerable force over an extended period, or to apply any additional force once [McKinney] was secured in the restraint chair." *Id.* at *10. The district court concluded that Jones, Elko, Moss, and Legear all "g[o]t physical" and "assisted with restraining" McKinney after he had his seizure in Room A–9, "going hands on" against McKinney for approximately five minutes. *Id.* at *9 (internal citations omitted). The district court also determined that Jones, Elko, Moss, and Womack actively participated in the process of taking McKinney out of the restraint chair and

forcing him into a prone position in the boat. *Id.* at *4. Accordingly, there was a genuine issue as to whether Jones, Elko, Moss, Legear, and Womack used unnecessary force against McKinney either during the struggle that occurred in Room A–9 or during the process of taking him out of the restraint chair and forcing him into the boat. This factor therefore also applies to each of the officers.

Third, the district court determined that the "officers used more force than was needed" because "[t]he officers were responding to a *medical* emergency, McKinney only exhibited defensive resistance after the officers escalated the use of force, and McKinney did not actively threaten anyone." *Id.* at *10 (emphasis in original). This factor applies to Jones, Elko, Moss, Legear, and Womack individually because the district court, as stated above, determined that there was an issue of fact as to whether each of these officers knew that McKinney was having a medical emergency. Further, the district court concluded that each of these officers actively participated in either escalating the use of force against McKinney in Room A–9 or in using force against him after he was confined to the restraint chair.

Fourth, the district court concluded that "the officers did not perceive a threat." *Id.* To support this conclusion, the district court cited an incident report in which Moss stated that McKinney "seemed dazed and incoherent" and was "highly erratic and being defensively resistant to staff" while he was in Room A–9. *Id.* (citing R. 178–33 at PageID #2668). Because the record establishes that Jones, Elko, Moss, Legear, and Womack all either actively participated in or observed the physical struggle that occurred Room A–9, R. 178–36 at PageID #2675; R. 178–23 at PageID #2632–2633, a material issue of fact existed regarding whether each of these offi-

cers saw that McKinney was dazed, incoherent, and defensively resistant, and therefore perceived that he was not a threat. Fifth, the district court concluded that "there is no evidence that the officers sought to deescalate the situation." *McKinney*, 2015 WL 4042157, at *10. Because the district court did not conclude that any officer tried to deescalate the situation, this factor applies to all of the officers. The district court's analysis of the *Hudson* factors therefore establishes that the district court conducted a sufficiently individualized assessment of the subjective component of excessive force.

The officers contend that the district court's statements that the court would "defer ruling on whether a particular [officer] may invoke qualified immunity" until further evidence had been presented at trial establish that the court failed to conduct an individualized assessment of each officer's qualified-immunity claim. Appellants' Br. at 28–29, 42–43; *McKinney*, 2015 WL 4042157, at *8, 11. This argument lacks merit. As stated above, although the district court sometimes referred to Jones, Elko, Moss, Legear, and Womack collectively as "the officers" or "the correctional officers," the district court conducted a sufficiently individualized assessment of the subjective components of deliberate indifference and excessive force as to each of these officers. Accordingly, read in the overall context of the district court's opinion, these statements reflect the court's acknowledgement that its denial of the officers' motions for summary judgment did not preclude the court from reconsidering its decision as the record develops. These statements do not show that the district court refused to assess individually each officer's qualified-immunity defense until further evidence was presented at trial. The officers' contention that the district court refused to individually assess

their qualified-immunity claims therefore does not provide a basis for relief.

## C.

We lack jurisdiction to consider the officers' argument that they are protected by the doctrine of state-law qualified official immunity. This is because the officers' argument is premised on factual disputes that we lack jurisdiction to consider on interlocutory appeal.

Like the district court's denial of the officers' federal qualified-immunity defenses, the district court's denial of the officers' state-law qualified-official-immunity defenses is reviewable only to the extent that it turns on an issue of law. This court has interlocutory appellate jurisdiction to review a district court's denial of qualified official immunity for Kentucky state-law claims. *Williams v. Sandel*, 433 Fed.Appx. 353, 359 (6th Cir.2011) (citing *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407 (6th Cir.2007); *Haney v. Monsky*, 311 S.W.3d 235, 239–40 (Ky.2010)). However, as stated above, the Supreme Court has held that a district court's denial of a federal qualified immunity claim is appealable only to the extent that the denial turns on an issue of law. *Mitchell*, 472 U.S. at 530, 105 S.Ct. 2806; *Johnson*, 515 U.S. at 319–20, 115 S.Ct. 2151. Relying on *Mitchell* and *Johnson*, the Court of Appeals of Kentucky has reasoned that a trial court's denial of a state-law qualified-official-immunity claim is also immediately appealable only to the extent that the denial turns on an issue of law. *Carl v. Dixon*, No. 2010–CA–000676–MR, 2011 WL 919896, at *1 (Ky. Ct. App. Mar. 18, 2011); *Broughton v. Russell*, No. 2009–CA–001753–MR, 2010 WL 4320436, at *1 (Ky. Ct. App. Oct. 29, 2010); *Medley v. Rogers*, Nos. 2007–CA–000936–MR, 2009 WL 50168, at *3 (Ky. Ct. App. Jan. 9, 2009). Similarly, this court has held that a defendant who is denied qualified official immunity under Kentucky law "may file an interlocutory appeal only if the appeal involves an abstract or pure legal issue." *Hedgepath v. Pelphrey*, 520 Fed.Appx. 385, 388, 391 n. 3 (6th Cir.2013) (internal quotation marks and citation omitted). Because the standard for qualified official immunity under Kentucky law "is materially similar to the one a plaintiff must meet to overcome a federal defense of qualified immunity," *King v. Taylor*, 694 F.3d 650, 665 (6th Cir.2012), these cases determined that *Mitchell* and *Johnson* govern the analysis of the officers' qualified-official-immunity claims. Accordingly, the district court's denial of the officers' qualified-official-immunity claims is reviewable only to the extent it turns on an issue of law.

This court lacks jurisdiction to review the district court's denial of the officers' qualified-official-immunity claims. This is because the denial is premised on factual disputes. The doctrine of qualified official immunity protects public officials from liability for negligent conduct when "the negligent act or omissions"—in addition to meeting other elements of the defense— "were made in good faith (*i.e.* were not made in 'bad faith')." *Rowan Cty. v. Sloas*, 201 S.W.3d 469, 475 (Ky.2006) (citing *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001)). " '[B]ad faith' can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position...." *Yanero*, 65 S.W. at 523. The officers contend that they are protected by the doctrine of qualified official immunity in part because the McKinney Estate "failed to establish deliberate indifference and excessive force, and thus have also failed to prove bad faith." Appellants' Re-

ply Br. at 26. However, as stated above, the district court concluded that there was a genuine issue of fact about whether the McKinney Estate established deliberate indifference and excessive force, and this court lacks jurisdiction to review that determination. Accordingly, since the resolution of officers' state-law qualified-official-immunity defenses is dependent on the same disputes of fact as the officers' federal qualified-immunity defenses, we dismiss this aspect of the officers' appeal for lack of jurisdiction.

### D.

The officers raise another legal issue, which is that the district court denied Arnold and Powell's motions for summary judgment even though the McKinney Estate waived its claims against these officers. The McKinney Estate stated in its response to the officers' motions for summary judgment that it no longer desired to pursue its claims against Arnold and Powell and had no objection to summarily dismissing the claims against these officers. R. 193–1 at PageID #5526. Despite this acknowledgment, the district court denied summary judgment to Arnold and Powell. *McKinney*, 2015 WL 4042157, at \*15. It is accordingly proper to reverse the district court's judgment denying Arnold and Powell's motions for summary judgment.

The judgment of the district court denying summary judgment to Jones, Elko, Legear, Moss, and Womack is affirmed. The judgment of the district court denying summary judgment to Arnold and Powell is reversed.