RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0071p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

---

DAVID M. HOPPER, Special Administrator of the Estate
of Robert Andrew Richardson, Sr.,

*Plaintiff-Appellee*,

*v.*

PHIL PLUMMER, Montgomery County Sheriff; TED
JACKSON, Sergeant; BRIAN LEWIS, Sergeant; DUSTIN
JOHNSON, Corrections Officer; MATHEW HENNING,
Corrections Officer; MICHAEL BEACH, Corrections
Officer; KEITH MAYES, Corrections Officer; BRADLEY
MARSHALL, Corrections Officer; MICHAEL STUMPFF,
Corrections Officer; ANDREW WITTMAN, Corrections
Officer,

*Defendants-Appellants*.

No. 17-3175

---

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 3:14-cv-00158—Michael J. Newman, Magistrate Judge.

Argued: December 5, 2017

Decided and Filed: April 12, 2018

Before: BATCHELDER, GRIFFIN, and WHITE, Circuit Judges.

---

#### COUNSEL

**ARGUED:** Keith Hansbrough, MARSHALL DENNEHEY WARNER COLEMAN &
GOGGIN, P.C., Cleveland, Ohio, for Appellants. Jeremy A. Tor, SPANGENBERG, SHIBLEY
& LIBER, LLP, Cleveland, Ohio, for Appellee. **ON BRIEF:** Lynnette Dinkler, Jamey T.
Pregon, DINKLER PREGON LLC, Dayton, Ohio, for Appellants. Nicholas A. DiCello,
SPANGENBERG, SHIBLEY & LIBER, LLP, Cleveland, Ohio, for Appellee.

---

**OPINION**

---

GRIFFIN, Circuit Judge.

Robert Richardson suffered a seizure two days after he was booked into the Montgomery County Jail in Dayton, Ohio. Corrections officers and medical staff responded to the medical call. Despite both a jail policy that prohibited placing restrained inmates in a prone position and a medic's appeal to handcuff Richardson in front, the officers handcuffed him behind his back and restrained him face down on the floor outside his cell. Richardson died after a twenty-two minute struggle during which record testimony indicates he continually stated he could not breathe.

Plaintiff David Hopper, in his capacity as Special Administrator of Richardson's estate, brought this 42 U.S.C. § 1983 action against the corrections officers and Montgomery County Sheriff Phil Plummer.[1] The district court denied defendants' motion for summary judgment on qualified- and statutory-immunity grounds. They appeal that order, and raise the precedential issue of whether Richardson, a civil contemnor detainee, falls within the protections of the Eighth or the Fourteenth Amendment. Because Richardson was sanctioned outside the criminal context, we hold that the Fourteenth Amendment governs his § 1983 claims. The remaining issues either lack merit or fall outside the limited scope of our jurisdiction on interlocutory appeal. We therefore affirm in part and dismiss in part.

I.

A.

In 2009, then-Ohio Governor Ted Strickland issued Executive Order 2009-13S, which addressed the use of prone restraints "across all state systems" and acknowledged "that there is a risk of sudden death when restraining an individual in a prone position." The Ohio Department

---

[1]Plaintiff also sued certain medical staff, but those defendants settled with plaintiff and are not involved in this appeal.

of Rehabilitation and Correction, among other state departments, was ordered to adopt a policy prohibiting the use of prone restraints, "defined as all items or measures used to limit or control the movement or normal functioning of any portion, or all, of an individual's body while the individual is in a face-down position for an extended period of time." The Montgomery County Jail adopted a use-of-restraints policy that prohibited "placing prisoners who are in restraints in prone or 'spread-eagle' positions."

B.

On May 17, 2012, Richardson was arrested on a capias warrant after failing to appear at a child-support enforcement hearing, and was booked into the Montgomery County jail. That same day, a Juvenile Court judge imposed a sentence of up to thirty days on Richardson for civil contempt, but the contempt could be purged and Richardson released upon payment of $2,500 to the Montgomery County Child Support Enforcement Agency.

Two days later, Richardson collapsed in his cell and his cellmate called for medical help. An overhead video camera recorded the twenty-two-minute incident that followed.[2]

The first officer to respond described Richardson as suffering an apparent seizure. Defendants Sergeant Ted Jackson and Officer Justin Johnson arrived "[l]ess than a minute" later. Richardson seemed lethargic and unbalanced, with blood and saliva coming from his mouth. He was sitting against the wall of his cell, trying to stand up. The officers told Richardson, who was a large man, to "stay down" because they were afraid he would fall down inside his small cell and hurt himself. Jackson and Johnson then pulled Richardson from his cell and placed him face down on the floor a few feet away.

A disoriented Richardson continued trying to stand so Jackson decided "to get him cuffed." By this point, several other defendant officers had arrived, including Sergeant Brian Lewis, Officer Michael Stumpff, Officer Bradley Marshall, and Officer Mathew Henning. A medic and a nurse had arrived as well. Jackson and Johnson, assisted by Lewis, Stumpff, and

---

[2]This video lacks sound and the image stutters because the camera recorded at a frame rate of only four frames per second. Accordingly, the following factual account is informed not only by the video, but also by other record evidence including deposition testimony.

Henning, cuffed Richardson's hands behind his back.  No defendant testified to hearing any instruction to do otherwise.

But the medic testified that he and a nurse "told corrections" at the outset to handcuff Richardson "in the front" and to put him on his back so medical staff could "better assess" him. Sergeant Lewis, said the medic, "overrode" that instruction.  According to the medic, it was "impossible to do a thorough exam" of Richardson because he was on his stomach.  Once Richardson was handcuffed, the medic tried to administer oxygen.  The nurse said she told the officers "that they need[ed] [to] make sure [Richardson] was on his side" to "keep that oxygen on him," and to "get him up and get him to medical."  Although Jackson requested a restraint chair at some point during the incident, Richardson stopped breathing and died before defendants attempted to move him.

C.

The district court found that the defendant officers each participated in restraining Richardson during a struggle that waxed and waned in intensity.  Sergeants Lewis and Jackson helped handcuff Richardson and supervised the other officers.  Officer Johnson placed his knees on either side of Richardson's legs and straddled the "thigh area."  Officer Henning was behind Johnson, and placed his left knee on Richardson's lower legs.  Officer Stumpff positioned himself near Richardson's head, and was "trying to hold onto [Richardson's left] shoulder[.]"  Officer Marshall knelt down next to Richardson's head, placed his knee in front of his right shoulder "to stop him from moving forward," and kept at least one hand on Richardson's shoulders or upper back throughout the incident, applying pressure as needed to control Richardson's movements.  The video appears to show Marshall placing his knee on Richardson's arm during the last few minutes of the incident.

Other defendants replaced several of these officers as the incident progressed.  Officer Michael Beach replaced Officer Johnson about seven minutes into the incident.  After fifteen minutes, Officer Keith Mayes relieved the medic positioned at Richardson's head, and used his hands to prevent Richardson from lifting his head up.  Mayes also took control of Richardson's

shoulders so he would not roll over. Officer Andrew Wittman arrived last, relieving Stumpff after about eighteen minutes, and held Richardson's left arm to the ground.

After twenty-two minutes, the officers realized Richardson was not breathing and began CPR. Officer Stumpff later acknowledged that Richardson "may have said" during the incident that he could not breathe. Officer Wittman agreed there was concern over Richardson's ability to breathe while restrained. Jason Haag, an inmate housed in the cell next to Richardson's, stated that Richardson "repeatedly . . . said he couldn't breathe," and tried "to get up to breathe," but "[defendants] kept pushing him back down until he stopped moving." Keith Wayne, another inmate, testified that he also heard Richardson say "I can't breathe[.]"

Defendants' efforts to revive Richardson were unsuccessful, and a doctor pronounced him dead less than an hour after the incident began. The deputy coroner concluded that Richardson's death was caused by "[c]ardiac arrhythmia." But one of plaintiff's medical experts determined that Richardson suffered a "fatal cardiac arrhythmia" only because the "manner of restraint impaired [his] ability to breath[e.]" Plaintiff's other medical expert agreed Richardson died from restraint asphyxiation. He elaborated that asphyxiation resulted from the "compression of Mr. Richardson's torso, including his upper back and neck[,] while he was subdued in a prone position with his hands cuffed behind his back." This expert explained that if an individual's arms and legs are restrained like Richardson's were, that individual cannot use them to alleviate the compressive pressure, will fatigue "[o]ver time," and his "[r]espiratory movements will ultimately stop."

D.

Plaintiff brought this § 1983 action against defendants. Relevant here, plaintiff alleged that the officers violated Richardson's rights under the Eighth or Fourteenth Amendment by using excessive force against him and by acting with deliberate indifference to his medical needs. Plaintiff further alleged that the officers violated Ohio state law by causing Richardson's wrongful death. Plaintiff also brought official-capacity claims against Sheriff Plummer alleging failure to train and supervise, and unconstitutional jail policy or custom.

The district court denied the officers summary judgment on qualified- and statutory-immunity grounds. Taking the evidence in the light most favorable to plaintiff, the district court determined that jurors "could reasonably conclude that officers applied compressive force upon a restrained Richardson's back, shoulder blades, shoulders, neck, hands, waist, thighs and lower legs throughout much of the twenty-two minute ordeal" and "that Richardson died as a result of position or restraint asphyxia while being restrained in a prone position by multiple corrections officers." It also held that genuine issues of material fact precluded summary judgment in favor of Sheriff Plummer on plaintiff's official-capacity claims.

The officers and Sheriff Plummer timely filed this interlocutory appeal.

II.

Qualified immunity shields public officials from civil liability under 42 U.S.C. § 1983 unless their actions violate clearly established rights "of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is "an *immunity from suit* rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), and protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). We review de novo a district court's denial of summary judgment in this context, and "draw all inferences in the evidence in favor of the nonmovant." *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017). To defeat defendants' motion on qualified-immunity grounds, plaintiff must come forward with evidence from which a jury could find "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks omitted).

Defendants raise four issues on appeal. The officers argue that (1) the district court's application of the Fourteenth Amendment to plaintiff's excessive-force claim was erroneous, and that no constitutional guarantee was clearly established at the time of the alleged misconduct, (2) the district court should have granted them qualified immunity on plaintiff's deliberate-indifference claim, and (3) the district court erroneously denied them statutory immunity under Ohio law. Sheriff Plummer maintains that (4) we should exercise pendent jurisdiction over, and

should dismiss, plaintiff's official-capacity claims against him. We address each argument in turn.

## III.

## A.

First, we must decide which constitutional guarantee plaintiff's excessive-force claim implicates. An excessive-force claim may arise under the Fourth, Eighth, or Fourteenth Amendments. While the Fourth Amendment's prohibition against unreasonable seizures bars excessive force against free citizens, *see Graham v. Connor*, 490 U.S. 386, 388 (1989), the Eighth Amendment's ban on cruel and unusual punishment bars excessive force against convicted persons. *See Whitley v. Albers*, 475 U.S. 312, 318–19 (1986). When an individual does not clearly fall within either category, the Fourteenth Amendment's Due Process Clause prohibits a governmental official's excessive use of force. *See Phelps v. Coy*, 286 F.3d 295, 299–300 (6th Cir. 2002).

The question is not merely academic because the standards of liability differ depending upon which amendment applies.[3] *Graham*, 490 U.S. at 393 ("We reject [the] notion that all excessive force claims brought under § 1983 are governed by a single generic standard;" courts must consider "whether the particular application of force might implicate a more specific constitutional right governed by a different standard."). When assessing excessive-force claims under the Fourth or Fourteenth Amendments, for example, we inquire whether the plaintiff has shown "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472–73 (2015) (holding in this § 1983 suit brought by a pretrial detainee alleging a violation of the Fourteenth Amendment's Due Process Clause that, in determining "whether force deliberately used is, constitutionally speaking, 'excessive,'" . . . courts must use an objective standard; thus "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable.");

---

[3]Defendants argue that we should "re-evaluate" the differing standards of liability because corrections officers need bright-line rules. We may not do so, however, because we are bound by precedent. *See, e.g., Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (declining to decide whether a subjective standard still applies in the context of Eighth Amendment excessive-force claims).

*Graham*, 490 U.S. at 397 (the "reasonableness" inquiry in this excessive force claim brought under the Fourth Amendment "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."). But a "prisoner must satisfy both an objective and a subjective component" to make out an excessive-force claim under the Eighth Amendment. *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011).

Defendants maintain that the Eighth Amendment applies here because Richardson was serving a definite jail sentence. Importantly, defendants do not appeal the district court's finding under the Fourteenth Amendment that "genuine issues of material fact remain concerning the reasonableness of the force used in this case." Indeed, "[h]ow much force [defendants] applied and for how long are disputed factual issues a jury must decide." *See Martin v. City of Broadview Heights*, 712 F.3d 951, 955 n.1 (6th Cir. 2013). Instead, defendants contend that we must reverse the district court because it did not make any factual findings relevant to the subjective prong of our Eighth Amendment analysis. Because the district court correctly determined that the Fourteenth Amendment governs, and thus obviated the need for any analysis under the Eighth Amendment's subjective prong, we disagree.

Richardson was sanctioned for contempt "in an ordinary civil proceeding." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994). Unlike civil contempt, "[c]riminal contempt is a crime in the ordinary sense," thus one cannot be punished for it without being "afforded the protections that the Constitution requires of . . . criminal proceedings." *Id.* at 826. But Eighth Amendment protections have not been held to apply "outside the criminal context." *Agg v. Flanagan*, 855 F.2d 336, 343 n.7 (6th Cir. 1988); *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010) (The Eighth Amendment "applies to excessive-force claims brought by convicted criminals serving their sentences.").

While a criminal contempt sanction is punitive and seeks "to vindicate the authority of the court," a civil contempt sanction is remedial and designed to coerce a future act for the benefit of the complainant. *See Bagwell*, 512 U.S. at 827–28 (citations omitted); *see also Uphaus v. Wyman*, 360 U.S. 72, 81 (1959). Richardson was to be detained for up to thirty days, but with the proviso that he could be released upon payment of $2,500 to the county Child

Support Enforcement Agency—a sentence imposed to coerce Richardson to complete a future remedial act for the benefit of the Complainant State of Ohio. That Richardson had a discharge date does not compel a different conclusion because "[i]mprisonment for a fixed term . . . is coercive when the contemnor is given the option of earlier release if he complies." *Bagwell*, 512 U.S. at 828 (citing *Shillitani v. United States*, 384 U.S. 364, 370 n.6 (1966) (upholding as civil "a determinate sentence which includes a purge clause")). A criminal sentence, by contrast, "cannot [be] avoid[ed] or abbreviate[d] . . . through later compliance." *Id.* at 828–29. And to the extent the relief provided in Richardson's case was a fine payable to a child support services agency in addition to his child support obligations, a fine "is remedial when it is paid to the complainant" rather than to the court. *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 632 (1988). Richardson was thus the classic civil contemnor detainee in that he "carrie[d] the keys of his prison in his own pocket" and could "end the sentence and discharge himself at any moment by doing what he had previously refused to do" for the benefit of the complainant. *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 442 (1911) (citation omitted).

The Fourteenth Amendment therefore governs plaintiff's excessive-force claim. In arguing the Eighth Amendment applies instead, defendants contend that the use of terms like "punish" and "penalty" in Ohio's contempt statutes indicates Richardson was being punished, not merely coerced. *See* Ohio Rev. Code § 2705.02, 2705.081, 2705.05. It is true that "[m]ost contempt sanctions . . . to some extent punish a prior offense as well as coerce an offender's future obedience," but any definitive "conclusions about the civil or criminal nature of a contempt sanction" must be drawn "from an examination of the character of the relief itself" as opposed to a sanction's "stated purposes" or "the subjective intent of a State's laws and its courts." *See Bagwell*, 512 U.S. at 828 (quoting *Hicks*, 485 U.S. at 635–36). In short, state statutory labels are not determinative. *See Hicks*, 485 U.S. at 631 ("[T]he labels affixed either to the proceeding or to the relief imposed under state law are not controlling and will not be allowed to defeat the applicable protections of federal constitutional law"); *cf. Liming v. Damos*, 979 N.E.2d 297, 301 (Ohio 2012) (distinction between civil and criminal contempt "usually based on the purpose to be served by the sanction"). As discussed above, whether Richardson was held in contempt for failure to appear or failure to pay child support, or both, the character of the relief underscores the civil nature of his sanction.

Defendants' reliance on two district court opinions that applied the Eighth Amendment to a civil contemnor's excessive-force claim is equally unavailing. In *Lewis v. Stellingworth*, the district court did so because the civil contemnor was "in custody" when the alleged misconduct occurred. No. 07–CV–13825, 2009 WL 1384149, at *6 (E.D. Mich. May 14, 2009). Although a civil contemnor has been found to be in contempt, any detention sanction would be imposed outside the criminal context and would not necessarily be primarily punitive in nature. *Lewis* goes astray in not considering any of the Supreme Court contempt precedent discussed above, and in relying instead on district court cases applying the Eighth Amendment to *criminal* contemnors' excessive-force claims. *See* No. 07–CV–13825, 2009 WL 1384149, at *6; *see also* Fed. R. Crim. Pro. 42. Because *Hammond v. Lapeer County* simply adopts the *Lewis* court's reasoning, it evidences the same analytical gaps. *See* 133 F.Supp.3d 899, 916–19 (E.D. Mich. 2015). Neither opinion is persuasive.

Richardson was not a free citizen at the time of the incident, but he had not been convicted of, and was thus not being punished for, any past criminal offense either. Even if Richardson's contempt sanction could be considered "quasi-criminal [in] nature" (as defendants maintain it should), by that very label it was not entirely so—leaving him, an individual within "some gray area" between free citizen and convicted criminal, protected by the Fourteenth Amendment's Due Process Clause. *See Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013); *see also Aldini*, 609 F.3d at 865.

For the reasons stated above, we affirm the district court's application of the Fourteenth Amendment to this plaintiff's excessive-force claim.

B.

Defendants also argue that no clearly established law barred unreasonable force against civil contemnor detainees in 2012. Plaintiff relies primarily on this court's opinion in *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004), as notice to defendants that their "conduct was unlawful in the situation [they] confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *modified on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). In *Champion*, we considered an excessive-force claim brought by the family of a severely autistic man who

died after several arresting officers restrained him, prone on the ground and handcuffed behind his back, for seventeen minutes. 380 F.3d at 897. Several witnesses described how the officers were "laying on top of" the man while "he was prone on the ground with his face towards the carpet." *See id.* at 898. We affirmed the denial of qualified immunity to the officers and explained that "[c]reating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes objectively unreasonable excessive force." *Id.* at 903. Although the man was also pepper sprayed, the application of asphyxiating force "by itself violated a clearly established right." *Id.* at 904.

Thus "the prohibition against placing weight on [Richardson's] body after he was handcuffed was clearly established in the Sixth Circuit as of" May 2012. *See Martin*, 712 F.3d at 961 (discussing *Champion*); *cf. Kulpa v. Cantea*, 708 F. App'x 846, 852–53 (6th Cir. 2017) (considering Fourteenth Amendment excessive-force claim in light of *Champion*); *Lanman v. Hinson*, 529 F.3d 673, 688–89 (6th Cir. 2008) (defendants violated clearly-established Fourteenth Amendment right to be free of undue restraint by restraining prone and subdued patient using "techniques that pose a substantial risk of asphyxiation"). Although not every defendant may have placed his weight on Richardson's torso, we have cautioned against taking "too cramped a view" of our precedent, and have explained that *Champion* "proscribes the use of 'substantial or significant pressure' that creates asphyxiating conditions in order to restrain a subject who does not pose a material danger to the officers or others." *Martin*, 712 F.3d at 961. Even though "*Champion* arose in the context of an arrest, the conduct at issue, the risk of death to the detainee, and the minimal threat posed by a bound and incapacitated detainee to officer safety is the same in a" jail. *Kulpa*, 708 F. App'x at 853.

In response to *Champion*'s admonition, defendants maintain that the presence of medical personnel distinguishes this case because defendants claim they restrained Richardson only to facilitate his medical treatment. No medical personnel were present while force was used on Champion, but defendants do not explain how this distinction is material to our clearly-established analysis here. There is no dispute that Richardson was suffering a medical emergency, or that while he may have kicked and thrashed, defendants did not consider him a threat to anyone after he was handcuffed. Champion, who had created a disturbance in a store

and "kick[ed] violently" while on the ground, arguably posed a threat. *Champion*, 380 F.3d at 897.

In any event, neither the mere presence of a third party at the scene nor defendants' professed reason for using force would excuse defendants' use of an otherwise unreasonable amount of force or alter relevant, clearly established constitutional guarantees. *See Kingsley*, 135 S. Ct. at 2476 (when viewing excessive-force claim through lens of Fourteenth Amendment, error to suggest that jury weigh officers' subjective reasons for using force); *see also Champion*, 380 F.3d at 904 ("motive is irrelevant"). We are cognizant that plaintiff must identify a case with a fact pattern similar enough to have given "fair and clear warning to officers" about what the law requires. *White*, 137 S. Ct. at 552 (quotation omitted). But such a case need not "be on all fours in order to form the basis for the clearly established right." *See Burgess*, 735 F.3d at 474; *cf. White* 137 S. Ct. at 552 ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers" where the unlawfulness is apparent).

Defendants also argue that they cannot be held liable for their actions because it was not clear in 2012 whether civil contemnor detainees fell within the Eighth or the Fourteenth Amendment. Although some district courts in this circuit may have applied the Eighth Amendment to civil contemnor detainee excessive-force claims, the Supreme Court long ago "t[ook] the position that the Eighth Amendment is inapplicable to [a civil contempt] sentence." *United States v. Dien*, 598 F.2d 743, 745 (2d Cir. 1979) (per curiam) (citing *Ingraham v. Wright*, 430 U.S. 651, 667–68 (1977)). Moreover, it is well-established that "the qualified immunity doctrine is an objective one[.]" *Champion*, 380 F.3d at 904; *see Harlow*, 457 U.S. at 818. We decline to accept the defense of qualified immunity based on defendants' "dubious proposition that, at the time the officers acted, they were on notice only that they could not have a reckless or malicious intent and that, as long as they acted without such an intent, they could apply any degree of force they chose." *See Kingsley v. Hendrickson*, 801 F.3d 828, 832–33 (7th Cir. 2015) (per curiam).

Nor can defendants escape liability merely because the incident in question occurred before the Supreme Court made it clear that the standard of liability applicable to Fourteenth Amendment excessive-force claims is purely an objective one. *Kingsley*, 135 S. Ct. at 2473. As

defendants acknowledge, we have rejected this argument before because "a defendant is not entitled to qualified immunity simply because the courts have not agreed upon the precise formulation of the [applicable] standard." *Guy v. Metro. Gov't of Nashville*, 687 F. App'x 471, 476 (6th Cir. 2017) (internal quotation marks omitted) (quoting *Harris v. City of Circleville*, 583 F.3d 356, 367 (6th Cir. 2009)); *see also Katz*, 533 U.S. at 202–03; *Pearson*, 555 U.S. at 236; *Kulpa*, 708 F. App'x at 853. Rather, the relevant question under the clearly established prong is whether defendants had notice "that [their] conduct was unlawful in the situation [they] confronted." *Katz*, 533 U.S. at 202.

We agree with the district court that *Champion*, among other precedent, gave such notice to defendants here. Accordingly, we affirm the district court's conclusion that it "[w]as unconstitutional" on May 19, 2012, to create asphyxiating conditions by "forcibly restraining an individual in a prone position for a prolonged period of time" when that individual posed no material threat.

IV.

Defendants argue they are also entitled to qualified immunity on plaintiff's deliberate-indifference claim. We analyze a Fourteenth Amendment claim for deliberate indifference to a serious medical need "under the same rubric as Eighth Amendment claims brought by prisoners." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013). Proving deliberate indifference requires that plaintiff demonstrate both: (1) the existence of a "sufficiently serious" medical need; and (2) that defendants "perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 702–03 (6th Cir. 2001) (citation omitted).

A.

As a threshold matter, defendants assert that the district court failed to conduct a sufficiently individualized qualified-immunity assessment in the context of plaintiff's deliberate-indifference claim. "[I]t is well-settled that qualified immunity must be assessed in the context of each individual's specific conduct." *Stoudemire v. Mich. Dep't. of Corrs.*, 705 F.3d 560, 570 (6th Cir. 2013). The district court acknowledged at the outset that it was required to conduct an

individualized assessment. When considering plaintiff's excessive-force claim, the district court determined that "all of the [defendants] either actively participated in the use of allegedly excessive force or supervised the other officers" and made individualized factual findings about each officer's actions during the incident that led to Richardson's death. The district court also referenced Haag and Wayne's testimony that Richardson "continually told officers that he could not breathe" while the "officers applied compressive force."

The district court emphasized this circumstantial evidence upon turning to the subjective component of plaintiff's deliberate-indifference claim. The district court again cited Haag's testimony that Richardson was "continually" telling "those on the scene" that he could not breathe. Haag's testimony was corroborated by that of inmate Wayne. The district court added that Stumpff "agrees that Richardson may have indicated" that he was having difficulty breathing and that Wittman also "testified that there was cause to be concerned about Richardson's ability to breathe." Building on its excessive-force analysis, the district court concluded that plaintiff's evidence taken in the light most favorable to him "demonstrates that Richardson continually told those on the scene that he could not breathe" but "[d]espite this cause for concern, the individual [defendants] each participated – or supervised – in Richardson's restraint for up to twenty-two minutes" rather than cede control of the scene to medical personnel.

Defendants fault the district court for failing to specify in the record where each officer testified that he heard Richardson's breathing complaints or to reference record evidence establishing that each officer was present "when Richardson was making such complaints." But no testimony concerning Richardson's breathing complaints links those complaints to a particular moment in time, and some witnesses, such as Stumpff, were present throughout the entire incident. A reasonable jury could infer that Richardson's pleas were ongoing and any of the officers could have heard them at the time that they were on the scene. Although the video has no sound, it does not blatantly contradict the district court's conclusion because it shows each defendant in close proximity to Richardson and would thus allow a reasonable juror to conclude that his voice could have reached them. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the

record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

The district court inferred from this evidence that each of the officers may have been aware of the contextual facts indicating Richardson's need for medical treatment because he was struggling to breathe while in a prone position. And "a defendant may not challenge the inferences the district court draws from th[e] facts, as that . . . is a prohibited fact-based appeal." *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015). Because the district court's finding of a genuine issue of material fact as to defendants' "knowledge of a substantial risk of serious harm" is premised on Richardson's continuous complaints about his inability to breathe, its qualified immunity inquiry was sufficiently individualized, even if it referred to "those on the scene" and the "individual" defendants rather than list each officer by name. *Cf. Phillips v. Roane Cty.*, 534 F.3d 531, 542 (6th Cir. 2008) ("[W]e do not read *Garretson* as prescribing a rule that plaintiffs cannot present general allegations to prove that each individual defendant has the requisite knowledge for deliberate indifference.") Defendants' argument provides no basis for relief.

## B.

Defendants also maintain that they did not disregard any substantial risk to Richardson because they were "working alongside" medical personnel. Because this argument is premised on factual disputes, we lack jurisdiction to consider it on interlocutory appeal. *DiLuzio*, 796 F.3d at 609–10. It is well-established that "[a] defendant challenging the denial of summary judgment on qualified immunity grounds must be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Thompson v. Grida*, 656 F.3d 365, 367 (6th Cir. 2011) (internal quotation marks omitted). We are precluded from deciding an interlocutory appeal premised on a challenge either to the inferences a district court draws from its record-supported factual determinations or to "'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial." *See DiLuzio*, 796 F.3d at 609–10.

Defendants do not accept the district court's conclusion that there was sufficient evidence to create a genuine issue of material fact. For example, defendants contend the district court failed to "factor into [its] analysis that medical staff was on the scene throughout" and "the

undisputed evidence is that corrections officers were holding Richardson so the medical personnel could assess and treat him." Yet the district court pointed to specific facts about the medical staff response, and underscored that defendants may have refused a medic's and a nurse's request to reposition Richardson to allow for a proper medical assessment. Defendants also do not accept the district court's finding that the plaintiff presented evidence that "Richardson continually told those on the scene that he could not breathe." Instead, they inappropriately argue that the evidence is insufficient to support that conclusion because not every officer testified to hearing Richardson's complaints or to being present when the complaints were made. We have noted that "the deliberate indifference threshold is higher for correctional officers where . . . an inmate is receiving medical treatment[.]'" *Shaver v. Brimfield Tp.*, 628 F. App'x 378, 383 (6th Cir. 2015). But our reasoning is premised on non-medical prison officials reasonably relying on or deferring to medical staff expertise, and it is sharply disputed whether and to what extent defendants did so here. *See id.*; *see also Ruiz-Bueno v. Scott*, 639 F. App'x 354, 360 (6th Cir. 2016).

Our decision in *McKinney v. Lexington-Fayette Urban County Government* is instructive. 651 F. App'x 449 (6th Cir. 2016). In that case, McKinney suffered a seizure while incarcerated and died after corrections officers placed him in a prone position while handcuffed behind his back. *Id.* at 451–56. As in this case, multiple officers responded when McKinney began displaying seizure activity and used "force to restrain and subdue McKinney." *Id.* at 451. And like the officers here, the defendant officers in *McKinney* relied on the presence of medical staff in support of their qualified immunity defense. *Id.* at 460 n.6. We declined to consider that argument on interlocutory appeal, concluding that:

> [t]he officers' arguments about the medical staff . . . pose questions of fact capable of resolution by competent evidence, including evidence about the officers' observations of facts that indicated that McKinney was in medical distress, the training that the officers received about how to care for an inmate who was in medical distress, and the officers' perceptions about the adequacy of the treatment that the medical staff provided to McKinney.

*Id.* This reasoning is equally applicable here.

"When the legal arguments advanced rely entirely on a defendant's own disputed version of the facts, the appeal boils down to issues of fact and credibility determinations that we cannot make." *Thompson*, 656 F.3d at 367. Because defendants' medical-personnel argument turns on such determinations, we cannot consider it on interlocutory appeal. *See DiLuzio*, 796 F.3d at 609–10 (allowing excision of "the prohibited challenge").

C.

Defendants also assert in a conclusory fashion that Richardson's right to medical care was not clearly established. They argue the district court erroneously relied on *Lanman v. Hinson*, in which we held in 2008 that the defendants violated a mental-health patient's clearly-established Fourteenth Amendment right to freedom from undue bodily restraint by continuing to restrain him in a prone position using "techniques that pose a substantial risk of asphyxiation" after the patient was subdued. 529 F.3d at 688–89. According to defendants, *Lanman* is irrelevant because it does not specifically involve "law enforcement officers working alongside qualified medical staff in dealing with an inmate not responding to commands and struggling with officers." To the extent defendants are merely repackaging their argument that the presence and activities of medical personnel absolves them of any liability, we have explained why that is a determination for a jury in this case.

Moreover, defendants neglect to mention the other cases referenced by the district court such as *May v. Township of Bloomfield*, which includes a discussion of our longstanding precedent establishing that a detainee has a constitutional right to medical care when an officer becomes aware that the detainee needs medical attention. *See* No. 11-14453, 2013 WL 2319323, at *13–16 (E.D. Mich. May 28, 2013). We made it clear in 1972 that "fundamental fairness and our most basic conception of due process mandate that medical care be provided to one who is incarcerated and may be suffering from serious illness or injury . . . where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness[.]" *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972).

Here, the district court found that "reasonable minds could conclude that Richardson was suffering from an obvious serious medical need" as he lay prone, handcuffed, and complaining

he could not breathe for the better part of twenty-two minutes. Defendants conceded in their motion for summary judgment that they each "were aware this was a medical situation, where Richardson was having some sort of medical issue," and that "this is not a case where [defendants] failed to get Richardson medical attention." We fail to see how, considering our precedent, a detainee like Richardson could have had no clearly established right to adequate medical care under circumstances even defendants admit indicated a need for medical attention.

In sum, defendants' medical-personnel argument is fact-bound and beyond our limited jurisdiction.

V.

Plaintiff also brings an Ohio tort claim for wrongful death against the officers, and defendants argue they should have been granted statutory immunity. Ohio law does not immunize "acts or omissions [done] with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). As relevant here, recklessness is conduct "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Argabrite v. Neer*, 75 N.E.3d 161, 164 (Ohio 2016).

The district court relied on its "analysis of Plaintiff's deliberate indifference claim" in concluding the officers were not entitled to statutory immunity because "a reasonable jury could find recklessness sufficient to overcome employee immunity" under Ohio law. When federal qualified immunity and Ohio state-law immunity under § 2744.03(A)(6) rest on the same questions of material fact, we may review the state-law immunity defense "through the lens of the federal qualified immunity analysis." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 n.1 (6th Cir. 2009); *cf. Stefan v. Olson*, 497 F. App'x. 568, 580–81 (6th Cir. 2012) (noting similarities between the Eighth Amendment "deliberate indifference" standard and Ohio's "wanton or reckless manner" standard). Just as a district court's denial of a federal qualified immunity claim is appealable only to the extent that the denial turns on an issue of law, *Mitchell*, 472 U.S. at 530, the Ohio Supreme Court has stated that a court of appeals "may resolve the appeal" of a trial court's denial of summary judgment on the basis of statutory immunity

"if [after de novo review of the law and facts] only questions of law remain[.]" *See Hubbell v. City of Xenia*, 873 N.E.2d 878, 882 (Ohio 2007).

Defendants make the same arguments here as they made in challenging the district court's deliberate-indifference findings: that there was an insufficient individualized inquiry as to each defendant's qualified immunity defense, and that the district court did not consider the presence of medical personnel throughout the incident. As discussed above, the district court's qualified immunity analysis was sufficiently individualized.

In support of their renewed medical-personnel argument, defendants rely on our decision in *Ruiz-Bueno v. Scott*. There, a pretrial detainee's estate sued jail officials under federal and Ohio law after the detainee died from a preexisting heart condition of which no one at the jail was aware. 639 F. App'x 354 at 355. We held that two deputies were entitled to statutory immunity against the plaintiff's state-law wrongful death and loss-of-consortium claims "[f]or the same reasons" they were entitled to federal qualified immunity against the plaintiff's deliberate-indifference claim. *Id.* at 365. In so concluding, we noted that the defendants "reasonably relied on the judgment of numerous doctors and nurses" treating the decedent and that there was no evidence that either deputy was subjectively aware of the detainee's condition. *See id.* at 356, 360–61. There is such evidence of subjective awareness here, therefore *Ruiz-Bueno* does not help defendants (who in any case allegedly did not "rel[y] on the judgment of" medical staff at the scene). *See id.* at 360.

Defendants' statutory immunity defense stands or falls with their federal qualified immunity defense. *Cf. Martin*, 712 F.3d at 963 (holding that "[a]s resolution of the state-law immunity issue is heavily dependent on the same disputed material facts as the excessive-force determination under § 1983, the district court properly denied summary judgment to the officers on the estate's state-law claims"). For the same reasons that we declined to accept defendants' defense of qualified immunity on plaintiff's deliberate-indifference claim, we decline to accept their defense of statutory immunity under Ohio law.

VI.

Finally, defendant Sheriff Plummer appeals from the district court's denial of summary judgment on plaintiff's § 1983 claims brought against him in his official capacity.[4] That is not an independently appealable "final decision" under 28 U.S.C. § 1291. *See Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 43 (1995). Accordingly, we may exercise our pendent appellate jurisdiction over Sheriff Plummer's appeal only if his motion for summary judgment is "inextricably intertwined with the qualified immunity analysis properly before the Court." *Lane v. City of LaFollette,* 490 F.3d 410, 423 (6th Cir. 2007). In other words, only "when the appellate resolution of the collateral appeal *necessarily* resolves the pendent claim as well." *Mattox v. City of Forest Park*, 183 F.3d 515, 524 (6th Cir. 1999) (quoting *Moore v. City of Wynnewood*, 57 F.3d 924, 930 (10th Cir. 1995)).

That is not the case here. The officers' appeal of the qualified immunity issues is not "inextricably intertwined" with Sheriff Plummer's appeal because their "liability turns on whether the force they used to restrain [Richardson] violated his clearly established constitutional rights," while municipal liability turns on separate questions of the jail's training and supervision obligations and practices as well as its policies and customs. *See Martin*, 712 F.3d at 963. Because pendent jurisdiction is inapplicable, we cannot consider Sheriff Plummer's interlocutory appeal. *See id.* ("[I]n the face of a constitutional violation, we lack subject-matter jurisdiction to entertain an appeal of the municipal-liability claim"); *see also Courtright v. City of Battle Creek*, 839 F.3d 513, 523–24 (6th Cir. 2016) (same); *Floyd v. City of Detroit*, 518 F.3d 398, 410–11 (6th Cir. 2008) (same).

VII.

For these reasons, we affirm in part and dismiss in part.

---

[4]"Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 n.55 (1978)).