NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0469n.06

No. 18-1800

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| TERRY PARNELL, | ) | **FILED** |
| | ) | |
| Plaintiff-Appellee, | ) | Sep 05, 2019 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| Defendant, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| RICHARD BILLINGSLEA; HAKEEM | ) | |
| PATTERSON; CLINTON MACK, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

Before: MERRITT and LARSEN, Circuit Judges.[1]

LARSEN, Circuit Judge. Several police officers face civil liability under 42 U.S.C. § 1983 for their involvement in the arrest, prosecution, and beating of Terry Parnell. The officers seek protection under the doctrine of qualified immunity. Because we agree with the district court that Parnell has presented enough evidence to overcome qualified immunity, we AFFIRM the district court's denial of summary judgment.

I.

"[A] defendant challenging the denial of summary judgment on qualified immunity grounds must be willing to concede the most favorable view of the facts to the plaintiff for purposes

---

[1] The third member of this panel, Judge Damon J. Keith, died on April 28, 2019. This order is entered by the quorum of the panel. 28 U.S.C. § 46(d).

of the appeal." *Hooper v. Plummer*, 887 F.3d 744, 757 (6th Cir. 2018) (alteration omitted). Accordingly we present the facts in that light now.

Terry Parnell spent the evening of January 14, 2016 celebrating his birthday with his fiancée, Nicole Cann, at her home in Detroit. Parnell was wearing a dark brown shirt, and Cann was wearing a multicolored Hawaiian-style shirt. Someone had broken into Cann's home the week before, and so she wanted to practice firing her legally purchased handgun. Cann went out to her front porch to fire several practice shots at the abandoned home north of her own. She went back into the house to reload and then returned to the front porch for more target practice. Parnell says that he never fired the gun, nor did he even step onto the porch while Cann was shooting.

After the first set of shots, a neighbor called 9-1-1. Two Detroit police officers, Richard Billingslea and Hakeem Patterson, responded at approximately 11:20 p.m. They drove south on Cann's street, scanning the houses (including Cann's) with their spotlights as they passed. Billingslea says that when the cruiser was several houses south of Cann's house, he looked in his rear-view mirror and saw a black male in a brown shirt shooting at the police cruiser from Cann's front porch; the man then ran inside. Billingslea told Patterson what he claimed to have seen and radioed that shots had been fired; additional officers soon arrived.

Officers knocked on Cann's front door, and both Parnell and Cann voluntarily came out of the house, with Cann yelling loudly that she had been the shooter. Ignoring Cann, the officers directed Parnell to stand up with his arms in the air and walk backwards toward them. Parnell complied with the officers' directions. Once he reached the officers, he was thrown to the ground and beaten. Parnell "suffered considerable bruising, lacerations, pain[,] and suffering from the beating." Parnell recalled Billingslea kicking him at least once but could not identify any other

officers who had participated.[2]  Patterson was in the immediate vicinity and helped Billingslea

drag the handcuffed Parnell to the police cruiser.  On the drive to the police station, Parnell asked

the officers why he had been arrested; Billingslea responded with profanity, telling Parnell to

"shut . . . up," and that he was "going down for attempted murder of a cop."  Billingslea later wrote

a report detailing the events of that night, including his allegation that he had seen Parnell fire

shots at the cruiser.

Cann, meanwhile, had given the officers permission to search the house, and they found

her loaded handgun.  She continued to loudly protest that she had been the one shooting, but the

officers ignored her.  Cann even called 9-1-1 to report that officers had wrongfully arrested Parnell.

Captain Mark Thornton (the highest-ranking officer at the scene) wrote an incident report,

stating that he could not confirm Billingslea's claims about being fired upon because Thornton

had found no bullet marks on the cruiser.  Sergeant Raymond Diaz, an evidence technician who

examined the scene later that night, likewise found no physical evidence to corroborate

Billingslea's account.  To the contrary, he found significant evidence consistent with Cann's

account.  He found no spent bullet casings at the south end of the porch, where Billingslea claimed

Parnell had been standing, but did find some at the north end, where Cann claimed to have been

standing while firing at the abandoned house next door.  Diaz also found bullet marks and bullets

on the side of the abandoned house.

Sergeant Clinton Mack was responsible for reviewing the various officers' reports and, if

he believed charges were warranted, submitting an investigator's report to the prosecutor, Pachia

Yang.  Mack reviewed all the incident reports, including Thornton's and Diaz's, and interviewed

---

[2] Parnell was able to identify Billingslea by name because, as it happened, Billingslea had arrested Parnell once before on charges that (like the charges here) were ultimately dismissed.

Parnell. He then submitted an investigator's report to Yang. But Mack's report did not mention Diaz's findings. Based on Mack's report, and after an additional conversation with Billingslea to confirm his claim that Parnell had fired at him, Yang charged Parnell with assault with a deadly weapon and other weapons crimes.

Mack and Billingslea attended Parnell's preliminary examination. Billingslea was the sole witness. He testified that he saw Parnell standing on Cann's front porch, shooting at the police cruiser. The state court found probable cause for the charges and bound Parnell over for trial.

On the morning of what would have been the first day of Parnell's trial, Diaz went on his own initiative to speak with the trial prosecutor, Barbara Lanning, about his evidence report. Before this meeting, Lanning had no knowledge of Diaz's findings or report. Lanning concluded, based on Diaz's evidence, that Billingslea's police report and preliminary examination testimony could not be accurate. On Lanning's motion, the trial judge dismissed the case without prejudice and without inquiring into the reason underlying the dismissal. Lanning later stated that she would never go to trial on the charges against Parnell, nor would she ever bring other charges arising out of the incident in question.

Parnell then filed this civil rights lawsuit in Michigan state court against the officers and the City of Detroit. The defendants removed the case to federal court. After extended discovery, Parnell dismissed his claims against the City of Detroit. The defendant officers moved for summary judgment based on qualified immunity, but the district court denied their motion. They timely appealed.

## II.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

*Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam).  When an officer raises a qualified immunity defense, we determine "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established."  *Harris v. Klare*, 902 F.3d 630, 637 (6th Cir. 2018) (quotation marks omitted).  We review the grant or denial of summary judgment de novo.  *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001).

### A.  Fourth Amendment Claims

Parnell brings several Fourth Amendment claims against Officers Billingslea and Mack. He asserts malicous prosecution against both officers; he also brings false arrest and false imprisonment claims against Billingslea alone.

To prevail on his § 1983 claim of false imprisonment and arrest, Parnell must prove that the defendants lacked probable cause to arrest him.  *See Voyticky v. Village of Timerblake*, 412 F.3d 669, 677 (6th Cir. 2005); *Wallace v. Kato*, 549 U.S. 384, 388 (2007) ("False arrest and false imprisonment overlap; the former is a species of the latter.").  To succeed on a Fourth Amendment malicious prosecution claim, Parnell must establish that:

> (1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from the initial arrest; and (4) the criminal proceeding was resolved in the plaintiff's favor.

*Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015).  Thus, to prevail on any of his Fourth Amendment claims, Parnell must show the absence of probable cause.  And so we begin with this common element.

1. Probable Cause

A state magistrate found probable cause to support Parnell's arrest, and then, after a preliminary examination, the state court found probable cause to support the charge and bound him over for trial. Ordinarily that would be the end of the matter. An arrest justified by a warrant proves the existence of probable cause for the arrest and precludes a § 1983 claim for false arrest or imprisonment. *Voyticky*, 412 F.3d at 677. Similarly, a bindover determination after a preliminary hearing, or a grand jury indictment, proves the existence of probable cause sufficient to call for trial on the charge and forecloses a claim for malicious prosecution. *King v. Harwood*, 852 F.3d 568, 587–88 (6th Cir. 2017). But Parnell may rebut the presumption created by these probable cause determinations with evidence that the officers "either knowingly or recklessly ma[de] false statements (such as in affidavits or investigative reports)" that was critical to the finding of probable cause or to the ultimate prosecution. *Id.* at 587; *Voyticky*, 412 F.3d at 677 n.4.[3] We conclude that the record, taken in the light most favorable to Parnell, could support a jury

---

[3] When a defendant raises an absolute immunity defense, we may not consider in this analysis "false statements, evidence, and omissions" that "consist solely of grand jury testimony or preparation for it," *King*, 852 F.3d at 587, because police officers, like other witnesses, are entitled to absolute immunity for their grand jury testimony. *Rehberg v. Paulk*, 566 U.S. 356, 368–69 (2012). The Supreme Court has indicated (albeit in dictum) that the same immunity applies to preliminary hearing testimony in states like Michigan, that use preliminary hearings to determine probable cause. *Id.* at 374–75. But absolute immunity must be affirmatively pleaded, or it is forfeited. *See Sanders v. Jones*, 845 F.3d 721, 733–34 (6th Cir. 2017), *vacated on other grounds*, 138 S. Ct. 640 (2018); *Kennedy v. City of Cleveland*, 797 F.2d 297, 300 (6th Cir. 1986). Billingslea, the only witness at the preliminary examination, has never asserted absolute immunity in this litigation. Accordingly, we need not exclude Billingslea's preliminary examination testimony from our analysis.

finding that both officers knowingly or recklessly made material false statements sufficient to rebut the state court's finding of probable cause.[4]

*Billingslea.* A reasonable jury could conclude that Billingslea's statements that he saw Parnell firing at him were knowingly or recklessly false. Parnell first points to the physical evidence recovered by Diaz, all of which is consistent with Parnell's account and inconsistent with Billingslea's. A reasonable jury could infer that Billingslea was aware of at least some of this physical evidence before he claimed in his police report, in his conversation with the prosecutor, and in his preliminary examination testimony that Parnell had fired shots at him; and, if this is so, a reasonable jury could infer that Billingslea's claims were either knowingly false or made in reckless disregard of the truth. Billingslea claimed that he found "spent casings on the porch" of Cann's home; but the only record evidence regarding the *location* of the spent casings—Diaz's evidence technician report—suggests that Billingslea must have found those casings not on the south end of the porch, where he claims Parnell was standing and firing, but on the north end, where Cann says she was standing while firing at the neighboring house. And Billingslea acknowledged at the preliminary examination that he and other police officers searched the area near his vehicle for bullets but found nothing, further undercutting his story that Parnell had fired at the cruiser.

The inconsistencies in Billingslea's story likewise are evidence of knowing or reckless falsehood. *See Zavatson v. City of Warren*, 714 F. App'x 512, 522 (6th Cir. 2017) ("Discrepancies

---

[4] This conclusion also suffices to dispatch the officers' analogous argument that Parnell's malicious prosecution claim is collaterally estopped by the state court's bindover determination. *See Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001) (where bindover determination allegedly rests on officer's false statements, the probable cause determination does not present the "same issue" for collateral estoppel purposes in later § 1983 action); *Hinchman v. Moore*, 312 F.3d 193, 203 (6th Cir. 2002) ("*Darrah* allows . . . a second bite at the probable-cause apple" when alleged false statements supported the bindover determination.).

between [the officer's] warrant request and his later testimony in this case also lend credence to the notion that [his] mistatements were intentional."). He wrote in his police report that the shooter "*appeared* to be" firing at him "due to the direction of the muzzle flash which was low range." (Emphasis added.) Captain Thornton, who spoke to Billingslea on the night in question, likewise reported that Billingslea could not "definitively tell [him] that [he] saw [Parnell] level the weapon at them." But the warrant prosecutor testified—and her notes confirm—that she only charged Parnell with felonious assault because Billingslea confirmed to her that he was *certain* that Parnell had fired at him. Likewise, at Parnell's preliminary examination, Billingslea said that he knew the shots had been fired toward him because he "looked through [his] rear-view mirror and saw the muzzle flash at a low angle towards [his] direction." Thus, when the question was whether Parnell should be detained and prosecuted, Billingslea had no doubts—he was sure he had been under fire. And yet, when it came time to defend his actions in this litigation, Billingslea backtracked, claiming in his deposition that he could not actually tell the direction of the shots, not even based on the muzzle flash. From these conveniently timed changes in Billingslea's story, a jury could infer deliberate or reckless falsehood.

Finally, a jury could infer deliberation or reckless disregard of the truth from the eyebrow-raising nature of Billingslea's claim. Billingslea claimed that, as he was driving away from Cann's house, he managed to look in his rear-view mirror and identify the shooter's shirt color (brown, according to Billingslea) in the moment. Keep in mind that the incident occurred well after dark; that Billingslea could have seen the shooter for only a brief moment; that Billingslea was several houses down the street from the purported shooter at the time; and that all the while, Billingslea claims, he was under fire. The nature of this claimed observation stretches credulity. Perhaps Billingslea will ultimately be able to prove that he saw exactly what he said, but in this posture we

must draw all reasonable inferences in Parnell's favor. And the implausibility of this particular statement supports the inference that it was deliberately false or at least reckless. *Cf. Barsky v. United States,* 339 F.2d 180, 182 (9th Cir. 1964) ("[C]ertainly when a witness relates a long, involved alibi, though possible but which is incredible and appears to cut across human experience, a lot of affirmative inferences can be drawn from the silliness of the story.")

*Mack.* Taking the evidence in the light most favorable to Parnell, a jury could find that Mack's report passed on material false information to the prosecutor with at least reckless disregard for the truth. A reasonable officer in Mack's place would realize there was a significant possibility—even a likelihood—that Billingslea's police report was false. Significant physical evidence unambiguously indicated that the shooter fired not toward the officers, but in the opposite direction. Mack saw Officer Thornton's report stating that the police found no bullets near the cruiser. And, in this posture, we must presume that Mack saw Diaz's report as well, which verified Cann's story and refuted Billingslea's. From the report, Mack knew that Cann had told Diaz that she had shot the weapon herself, in a manner consistent with Diaz's physical evidence. Because Mack affirmatively included inaccurate factual information while simultaneously omitting material contradictory evidence that he possessed, a jury could infer deliberate or reckless falsehood. *See King*, 852 F.3d at 582–83, 591 (finding that a reasonable jury could infer deliberate or reckless disregard for the truth where the officer initiated prosecution against the plaintiff despite knowing from ballistic reports that the plaintiff's gun was not the murder weapon and that the bullet holes in the plaintiff's home were not caused by the bullets that killed the victim); *see also Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018) (holding that a factually false statement *plus* the omission of material, exculpatory evidence in the officer's possession was sufficient to

show reckless disregard). This evidence is sufficient to rebut the presumption of probable cause brought about by state court's bindover decision.

*Insufficient Untainted Evidence of Probable Cause.* But that does not end the matter. The officers claim that—even if the state's probable cause determinations are not given conclusive effect—they are still not liable if there was, in fact, probable cause. That assertion is right as a matter of law. *See Vakilian v. Shaw*, 335 F.3d 509, 517–18 (6th Cir. 2003); *see also Burleigh v. City of Detroit*, 80 F. Appx. 454, 458 (6th Cir. 2003) ("This alleged exaggeration of the facts need not detain us, however, if other undisputed facts support the state court's probable cause determination."). But, in this posture, it is unavailing as a matter of fact. Because this is an appeal from the denial of qualified immunity, we must view the facts in the light most favorable to Parnell. *Hooper*, 887 F.3d at 757. And so the question is whether, stripped of all the officers' allegedly false statements or omissions, there remains sufficient evidence, taken in the light most favorable to the plaintiff, to support a finding of probable cause. "Yes," say the officers—Billingslea made an eyewitness identification of Parnell in the act of shooting at the police cruiser and, even if that turned out to be mistaken, the identification alone is sufficient to support a finding of probable cause. This argument misses the point. Parnell's claim is that the eyewitness identification itself was either a lie or a recklessly false statement; for the reasons discussed above, a reasonable jury could agree. And without Billinglea's identification, there is no other evidence to support probable cause.

Because a reasonable jury could find the absence of probable cause to support Parnell's arrest, Parnell's Fourth Amendment claims against Billingslea for false arrest and imprisonment must go to the jury. And a reasonable jury could also find for Parnell on the lack-of-probable

cause element of his malicious prosecution claim against both officers. We now turn to the other contested elements of that claim.[5]

### 2. Made, Influenced, or Participated in the Decision to Prosecute

An officer is not liable for malicious prosecution under § 1983 unless he "made, influenced, or participated in the decision to prosecute the plaintiff," *Webb*, 789 F.3d at 659, "in more than a passive or neutral way," *Johnson v. Moseley*, 790 F.3d 649, 654 (6th Cir. 2015). That means "there must be some element of blameworthiness or culpability in the participation—albeit less than 'malice.'" *Id.* at 655. We have said that "providing false information to the prosecutor that bore directly on whether there was probable cause" counts as "influencing" a decision to prosecute, at least when the officer reasonably could have forseen that his actions would lead to the prosecutor bringing charges. *Sykes v. Anderson*, 625 F.3d 294, 314–15 (6th Cir. 2010).

Did the false information supplied by Billingslea and Mack influence the decision to prosecute Parnell? We believe a reasonable jury could so conclude. The investigator's report that Mack submitted relied almost exclusively on Billingslea's police report, and Yang testified that she made the charging decision on the basis of those documents. In addition, Yang stated that she personally spoke with Billingslea before bringing the assault charge because she wanted to confirm that he would testify "that he was shot at." Had Billingslea told Yang only that he *thought* he had been shot at, Yang would have required more information before approving a felonious assault charge, information which Billingslea never gave her. Given that Billingslea's view of the events was crucial to the criminal charge, it was reasonably foreseeable that the false information provided by Billingslea and Mack to Yang would have influenced Yang's decision to prosecute Parnell. *Id.*

---

[5] After the state court found probable cause at the preliminary hearing, Parnell was bound over for trial and released on a $7,500 bond. The officers do not dispute that this was a deprivation of liberty separate from the initial arrest.

We conclude, therefore, that Billingslea and Mack influenced the prosecution "in more than a passive or neutral way." *Johnson*, 790 F.3d at 654.

### 3. Termination in Parnell's Favor

We now consider the last disputed element of malicious prosecution—whether the proceedings terminated in Parnell's favor when the district court dismissed the case against Parnell without prejudice. There is no binding precedent in this circuit as to whether a dismissal without prejudice can constitute a favorable termination for § 1983 purposes. The officers offer a variety of district court opinions as support for their conclusion that a dismissal without prejudice can never constitute a favorable termination.[6] Yet, the officers also acknowledge that "an abandonment of a prosecution by the prosecutor . . . generally constitutes a termination in favor of the accused," so long as the "final decision indicates that the accused is innocent." We note that this is the test set forth in the Restatement (Second) of Torts §§ 659, 660 (1977). And it appears to be exactly what we have here.

Upon learning of the undisclosed evidentiary report, the prosecutor immediately decided to dismiss the charges because she believed she could not prevail at trial. The prosecutor informed defense counsel that she would seek dismissal because of the contradictory evidence, and she later testified that she would never go to trial on the charges against Parnell, nor would she ever bring other charges arising out of the incident in question. Given the evidence we have before us on appeal, which we must view in a light most favorable to Parnell, he has shown sufficient evidence of a "formal abandonment" of the charges based on his innocence, *see* Restatement (Second) of Torts § 659 (1977), such that his claim survives summary judgment on this prong. Because he has

---

[6] Coincidentally, one of those cases is another § 1983 suit filed against Officer Billingslea. *See Craft v. Billingslea*, No. 17-cv-12752, 2017 WL 6039559, at *5 (E.D. Mich. Dec. 6, 2017).

produced enough evidence to satisfy all of the tort's elements for summary judgment purposes, Parnell's malicious prosecution claims against Mack and Billingslea must go to a jury.

### B. Failure to Intervene

We move now to Parnell's claim against Patterson for failure to intervene against the other officers' excessive force. In denying Patterson's motion for summary judgment, the district court concluded that the record (in the light most favorable to Parnell) showed that "Patterson was near enough to have intervened to protect [Parnell] from Billingslea's actions." Patterson disputes this factual determination, arguing that he "did not observe the alleged conduct and did not fail to intervene" but was rather "scanning [his] surroundings" when the assault occurred. But for purposes of this appeal Patterson must "concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Hooper*, 887 F.3d at 757.

Patterson claims that he is entitled to qualifited immunity because his actions were objectively reasonable. We disagree. On Parnell's version of the facts, Parnell was fully compliant and unarmed but was nevertheless "thrown to the ground and beaten." Patterson was close enough to the alleged beating that afterward he helped drag the bruised and bloody Parnell to his own cruiser. It has long been clearly established that an officer must intervene to prevent excessive force by other officers in his presence. *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982). And a reasonable officer would know that the force Parnell alleges was excessive because, as the district court noted, "[a]ssaulting an unarmed and compliant individual has been a clearly established violation of the Fourth Amendment for decades." *See, e.g.*, *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994); *McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir. 1988). A reasonable officer, as close as Patterson was, could have and should have intervened. Since Patterson failed to do so, he is not entitled to qualified immunity at this point.

### C. State Law Claims

Parnell asserts state tort claims against Billingslea for assault and battery, false arrest and imprisonment, and malicious prosecution.  On each of these claims, Billingslea argues that he is entitled to governmental immunity.  Governmental immunity under Michigan law is available only to those who have acted in good faith—that is, those who have not acted "maliciously or with a wanton or reckless disregard for the rights of another."  *Odom v. Wayne County*, 760 N.W.2d 217, 227–28 (Mich. 2008).  Viewing the facts in the light most favorable to Parnell, Billingslea did not act in good faith.  A reasonable jury could conclude that Billingslea lied about Parnell shooting at him; that he arrested Parnell on the basis of this false accusation; that at least once, Billingslea kicked the unarmed, submissive Parnell; and that he intentionally or recklessly recorded the untrue accusation in his police report and repeated it in a conversation with the prosecutor who approved the charges.  In this posture, we cannot say that Billingslea is entitlted to governmental immunity on Parnell's various state law claims.

* * *

We AFFIRM the district court's denial of summary judgment in all respects.